IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD E. GROFF,

                   Plaintiff,

    v.

LOUIS DEJOY, Postmaster General, United States
Postal Service,

                   Defendant.

CIVIL ACTION
NO. 19-1879

**MEMORANDUM OPINION**

**Schmehl, J.**   **/s/ JLS**                        **April  6, 2021**

## I.    INTRODUCTION

Plaintiff, Gerald Groff ("Groff" or "Plaintiff") brings this suit against his former employer, Louis DeJoy, Postmaster General, United States Postal Service ("Defendant"). Groff's Complaint contains a cause of action for religious discrimination under two different theories: disparate treatment and failure to accommodate. Before the Court is the Motion for Summary Judgment of Defendant, the Motion for Partial Summary Judgment of Groff, the parties Joint Statement of Material Facts, and Plaintiff's Motion for Sanctions. All motions have been responded to and oral argument has been held. For the reasons discussed more fully below, Defendant's Motion for Summary Judgment will be granted, and Groff's Motion for Partial Summary Judgment will be denied.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. Proc. 56(c).  "A motion for summary judgment will not be defeated by 'the mere existence' of

some disputed facts but will be denied when there is a genuine issue of material fact."

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). A fact is "material" if

proof of its existence or non-existence might affect the outcome of the litigation, and a

dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable

to the non-moving party. "After making all reasonable inferences in the nonmoving

party's favor, there is a genuine issue of material fact if a reasonable jury could find for

the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d

Cir. 2010) (*citing Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)).

While the moving party bears the initial burden of showing the absence of a genuine

issue of material fact, meeting this obligation shifts the burden to the non-moving party

who must "set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 250.

III.   **FACTUAL BACKGROUND**

Groff identifies as an Evangelical Christian within the Protestant tradition. (Joint

Statement of Facts, ¶ 1.) On April 7, 2012, he was hired as a Temporary Relief Carrier at

the Quarryville Post Office for the USPS. (*Id.* at ¶ 2.) He transferred to the Paradise Post

Office as a Rural Carrier Associate on July 14, 2012. (*Id.* at ¶ 4.) As an RCA, Groff was

classified as a "non-career" employee, responsible to cover for the work of any Rural

Route Carrier (a "career" employee) in the delivery of mail and packages. (*Id.* at ¶ 5.)

Part of being an RCA is being flexible. (*Id*.) Most career employees who are mail carriers

2

began their USPS employment as a noncareer employee. An RCA is one such non-career

position. This is generally an entry-level position. (JSOF at ¶ 6.) RCAs are responsible

for the safe and efficient delivery and collection of the mail, working part-time to cover

for regular carriers. (https://about.usps.com/publications/pub181.pdf.) Work hours vary

depending on the office and route. *Id.* As flexible, relief carriers, all RCAs must be

willing to work weekends and holidays. *Id.* RCAs are neither guaranteed specific hours

or set schedules and are scheduled on an as-needed basis. (*See* Hess Decl. at ¶3, ECF No.

36, Ex. E.)

Groff was part of the Central Pennsylvania District of USPS, which includes Lancaster

County. (*Id.* at ¶ 7.) In an effort to remain profitable, in 2013, the USPS signed a contract

with Amazon pursuant to which the USPS would deliver Amazon packages. (Groff Dep.

at 159, 166). It was critically important to the USPS that Sunday Amazon delivery be

successful. (Hess Decl. ¶4.)

On May 24, 2016, USPS and the National Rural Letter Carriers Association

("Union") entered a Memorandum of Understanding ("MOU") about how the USPS

would deliver for Amazon. (*Id.* at ¶ 8.) The MOU sets forth a detailed procedure for

Sunday Amazon deliveries. First, the union creates a list of all part-time flexible rural

carriers, substitute carriers, RCAs, and rural carrier relief employees. Then, every

employee is asked if he or she wants to work on Sundays and holidays. Then two lists are

created: one of employees who want to volunteer to work on Sundays and holidays; and

one of employees who do not. (*Id.* at ¶ 9.) On any given Sunday or holiday, management

determines how many carriers are necessary given the expected mail volume. (*Id.* at ¶

10.) Under the MOU, management then assigns carriers as follows: First management

schedules assistant rural carriers ("ARCs"). If there are sufficient ARCs, no additional part-time flexible carriers are scheduled. If there are insufficient ARCs, management then schedules additional carriers from the volunteer list, on a rotating basis. If between the ARCs and volunteers there are sufficient carriers to cover the need, no additional part-time flexible carriers are scheduled. If there are insufficient carriers between the ARCs and volunteers, additional part-time flexible carriers are scheduled, on a rotating basis, from the non-volunteer list. (JSOF at ¶ 10.) Pursuant to the MOU, a part-time flexible carrier may be bypassed in the rotation if the part-time flexible carrier has approved leave or a non-scheduled day adjacent to the Sunday or holiday or scheduling the part-time flexible carrier to work on Sunday or holiday would result in the carrier exceeding 40 hours at the end of the work week. In addition, RCAs covering the extended vacancy of full-time career carriers are only scheduled if all other part-time flexible carriers have been scheduled and more carriers are still needed. (*Id.* at ¶ 11.)

For RCAs, seniority is based on time in service in a particular office, not based on time working for USPS as an organization. (*Id.* at ¶ 12.) In 2015, prior to the enactment of the MOU, exempting an RCA from Sunday delivery was within the discretion of the postmaster. (Hess Decl. ¶7.) The relatively large Quarryville station had other carriers available to deliver on Sundays. (*Id.* at ¶5.) The Quarryville station began delivering Amazon packages on Sundays in 2015, (Groff Dep. at 161, 169, ECF No. 36, Ex. B,) and Groff negotiated with his then-postmaster, Patricia Wright, to be exempt from working on Sundays. (*Id.* at 108.) In 2016, Postmaster Wright informed Groff that she would no longer be able to exempt him from Sunday work. (Groff Response to Interrogatory No. 5, ECF No. 36, Ex. C.)

After learning he would no longer be exempted from Sunday work in Quarryville, Groff requested reassignment to the Holtwood station, which was not yet delivering Amazon packages on Sundays. (Groff Dep. at 161.) At all relevant times that Groff was working at Holtwood, Brian Hess was Groff's Postmaster. (JSOF at ¶ 13.) When Hess hired Groff, he knew Groff transferred to avoid Sunday Amazon deliveries due to Groff's religious beliefs. (*Id*. at ¶ 14.) No one ever promised Groff that the station would continue to be so exempt or that he specifically would be exempt from delivering on Sundays. (*Id*. at ¶ 15.)

From the time he first transferred to the Holtwood station until March of 2017, Groff got along well with Postmaster Hess and the other employees in that station and was never disciplined. (*Id.* at ¶ 17.) Beginning in March of 2017, the Holtwood Post Office was required to participate in Amazon package deliveries, which meant Groff could be scheduled to work on Sundays. (*Id*. at ¶ 18.) The first Amazon schedule involving Holtwood carriers was for Sunday, March 19, 2017, and Groff was scheduled for that Sunday. (*Id.* at ¶ 16.)

From the time Groff was required to participate in Sunday Amazon deliveries until his employment with USPS ended on January 18, 2019, Groff never worked on a Sunday, although he did make Amazon deliveries on holidays that were not a Sunday. (JSOF at ¶ 21.) Management suggested all the following accommodations to Groff: If he was scheduled on a Sunday, he could take another day that week entirely off from work as a day of worship or he could come in later on a Sunday, after church. Management also suggested that it would contact other stations to attempt to find coverage for Groff when he was scheduled on a Sunday, and if coverage was found, Groff would be excused. (*Id*.

at ¶ 22.) Groff was also permitted to find his own coverage for Sundays that he was assigned to work. (Hess Dep. at 122, 126, ECF No. 36, Ex. F.)

Groff was scheduled but did not report to work on the following days: March 19, 2017; April 2, 2017; April 16, 2017; April 23, 2017; May 7, 2017; May 21, 2017; June 11, 2017; July 2, 2017; July 23, 2017; August 6, 2017; August 28, 2017; September 17, 2017; October 1, 2017; October 15, 2017; December 3, 2017; December 17, 2017; January 14, 2018; March 4, 2018, March 18, 2018; March 25, 2018; April 1, 2018; April 8, 2018; April 22, 2018; and May 13, 2018. (JSOF at ¶ 23.) This is at least 24 scheduled Sundays where Groff was scheduled and did not report to work. (*Id*.) When the plaintiff was scheduled on a Sunday and did not work, it upset the other carriers. (Evans Dep. at 42, ECF No. 36, Ex. I; Hess Dep. at 41.) There were complaints. (French Dep. at 23) and discussion of a boycott. (Hess Dep. at 41-42.) One carrier transferred from Holtwood because he felt it was not fair that the plaintiff was not reporting on scheduled Sundays. (Hess Dep. at 102.) Another carrier resigned in part because of the situation. (Hess Dep. 103.) When the plaintiff was scheduled and did not work, it complicated the scheduling and planning processes and created more difficulties in timely delivering the packages. (Evans Dep. at 42-43; French Dep. at 31; Hess Dep. at 82.) Skipping Groff in the rotation meant other carriers had to work more Sundays than they otherwise would have had to. (Hess Dep. at 49, 82.)

Groff claims that Postmaster Hess treated other carriers better than him and required him to deliver the mail even when there was bad weather. Groff recalled this happening only on two specific occasions. Once there was an ice storm and it caused the plaintiff to be an hour later than the other carriers in delivering his route, and another

time Hess ordered Groff to assist other carriers who needed help. (Groff Dep. at 289-290.) However, the record shows that Plaintiff was the most experienced RCA in the station, one of the other RCAs was still relatively new, and the timecards show that Groff had the fewest pieces of mail to deliver and finished his work the earliest. (Groff Dep. at 349-350.)

On one occasion Postmaster Hess said to the plaintiff that the picture on his badge reminded him of "the guys on the front of that morning's newspaper." (Groff Dep. at 239.) The paper had photos of people who had been arrested for sexual deviance in a local park. (*Id.* at 240.) Groff did not contemporaneously report this comment to anyone in management, nor did he tell Hess that he didn't appreciate the comment. (*Id.* at 240-243.) Employees in Holtwood sometimes made jokes and teased each other. (*Id.* at 243-244.) More than once there was joking in the station about an employee's photo. (Groff Dep. 243-244.)

During the non-peak season of 2018, Postmaster Hess sometimes found coverage so that Groff did not have to work. (JSOF at ¶ 24.) Hess looked for substitutes for Groff each week, including from other post offices. (Hess Dep. at 122-123.) Hess notified Groff that USPS can progressively impose discipline on him for refusing to work Sunday, beginning with a letter of warning, to a 7-day suspension, to a 14-day suspension, and then termination. (JSOF at ¶ 25.) However, paper suspensions do not cause an employee to lose work or pay, (*Id.* at ¶ 26) as within the USPS, discipline is intended to be "corrective" in nature, not punitive. (*Id.* at ¶ 27.)

Solely by virtue of Groff not reporting for work on Sundays, USPS held eight (8) Performance Discipline Interviews ("PDIs") with Groff and imposed progressive

discipline as follows: On June 9, 2017, USPS issued Groff a Written Letter of Warning. On January 2, 2018, USPS issued Groff a 7-Day Paper Suspension. On October 5, 2018, USPS issued Groff a 14-Day Paper Suspension. (*Id.* at ¶ 28.) For Groff, the discipline imposed on him was intended to correct his "[n]ot reporting to work as scheduled" on Sundays. (*Id.*) Aside from attendance, Groff otherwise had an excellent performance as an RCA, being a good and efficient employee. (*Id.* at ¶ 29.)

On April 5, 2017, Groff was summoned for a PDI with Station Master Aaron Zehring for failing to report to work on Sunday. (*Id.* at ¶ 30.) Zehring suggested Groff pick a different day of the week for observance of the Sabbath. (*Id.* at ¶ 32.) As a result of the July 11, 2017, Letter of Warning, Groff contacted an Equal Employment Opportunity counselor at USPS regarding his allegation that the USPS failed to give him a religious accommodation from Sunday deliveries. (*Id.* at ¶ 32.)

USPS next issued Groff a 7-Day Paper Suspension for not working Sunday, December 3, 2017, or December 17, 2017. (JSOF at ¶ 33.) As a result of this 7-Day Paper Suspension, on February 3, 2018, Groff again contacted an Equal Employment Opportunity counselor at USPS. (*Id.* at ¶ 34.)

Brian Hess held a PDI with Groff on September 6, 2018, due to Groff not reporting for work on Sundays, and USPS issued Groff a 14-Day Paper Suspension on October 5, 2018, for not reporting for Sunday deliveries on June 17, 2018, August 12, 2018, and August 26, 2018. (*Id.* at ¶¶ 35-36.) As a result of this 14-Day Paper Suspension, Groff again complained through the EEO process, (*id.* at ¶ 37) then resigned his employment on January 18, 2019. (*Id.* at ¶ 38.) Groff also had additional Sunday absences in the time

period following the September 6, 2018, PDI and receiving the 14-Day Paper Suspension on October 5, 2018. (JSOF at ¶ 39.)

When implementing the Amazon contract in the Central Pennsylvania District, USPS drew a distinction between the "peak" and the "non-peak" seasons. The "peak" season varied but was generally defined as the Sunday before Thanksgiving until the first or second week of the new year. (*Id.* at ¶ 42.) During the non-peak season, all RCA's in Lancaster County had to report for Sunday and holiday deliveries at the Lancaster County Annex in Lancaster City. (*Id.* at ¶ 43.) During the peak season, all Amazon deliveries were handled in each respective post office, using its own staff and without the Lancaster County Annex. (*Id.* at ¶ 44.)

RCAs have no contractual right to specific days off, (JSOF at ¶ 45) but receive overtime pay for working Sundays and holidays. (*Id.* at ¶ 46.) During non-peak season, RCAs were permitted to volunteer to always be scheduled for Sunday delivery. (*Id.* at ¶ 47.) Otherwise, Sunday delivery was assigned during nonpeak season using a rotating schedule for all RCAs, without regard to seniority. (*Id.*) No RCA had more or less of a right to have Sunday off than another RCA. (*Id.* at ¶ 48.) It would have been futile for Groff to have transferred to any other post office as an RCA because all RCAs must be available to deliver for Amazon deliveries on Sundays. (*Id.* at ¶ 40.)

During some non-peak seasons at issue in this case, Diane Evans was the Supervisor at the Lancaster County Annex in charge of assigning RCAs for Amazon deliveries on Sundays and holidays. (*Id.* at ¶ 49.) Once she created a list of Sunday assignments, it would then be reviewed and finalized by Lancaster City Postmaster Douglas French, who then circulated it to other postmasters and verified with them that

their employees were notified. (JSOF at ¶ 49.) During the non-peak season, RCAs were drawn from the entirety of Lancaster County and reported to the Lancaster County Annex for an assigned route that could be anywhere in Lancaster County, including outside of that RCA's regular workplace. (*Id.* at ¶ 50.)

During the "peak" season, Hess typically located another RCA who volunteered to cover Groff's Sunday shifts. (*Id.* at ¶ 51.) In the absence of unforeseeable issues where someone called-out at the last minute, Hess was able to find volunteers for most of Groff's Sunday shifts at Holtwood. (*Id.* at ¶ 52.) When Groff was scheduled and did not work, it complicated the scheduling and planning processes. (Evans Dep. at 42-43; French Dep. at 31; Hess Dep. at 82.) Similarly, when Groff was scheduled and did not work, it created more difficulties in timely delivering the packages. (Evans Dep. at 43.) Skipping Groff in the rotation meant other carriers had to work more Sundays than they otherwise would have had to. (Hess Dep. at 49, 82.) The USPS had difficulty getting carriers to work on Sundays and many RCAs resigned. (Evans Dep. at 14; Hess Dep. at 75.)

Neither Postmaster Hess nor anyone else in management ever made negative comments to Groff relating to his religion. (Groff Dep. at 286-287.) Supervisor Evans, Postmaster French, Labor Relations Manager Gaines and Postmaster Hess all deny discriminating against, retaliating against, or treating Groff any differently because of his religion or his religious objection to working on Sundays. (Evans Dep. at 43-44; French Dep. at 47-48; Gaines Dep. at 87-88; Hess Dep. at 202-203.) Further, Postmaster Hess and Supervisor Evans are both Christian, and Postmaster French is Catholic. (ECF No. 36, Ex. D, USPS00132, 00153, 00211.)

**IV.**   **DISCUSSION**

Defendant argues that the claims contained in Plaintiff's Complaint for religious discrimination should be dismissed. For the reasons set forth below, Defendant's motion for summary judgment will be granted and Plaintiff's Complaint will be dismissed. Further, Plaintiff's motion for partial summary judgment as to his failure to accommodate claim will be denied.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, employees may assert two different theories of religious discrimination: failure to accommodate and disparate treatment. *E.E.O.C. v. Aldi, Inc.*, 2008 WL 859249, at *5 (W.D. Pa. Mar. 28, 2008); *citing Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 281 (3d Cir. 2001).

**A.  DISPARATE TREATMENT**

To survive a motion for summary judgment on disparate treatment, Plaintiff can show direct or indirect evidence of discrimination. The typical *McDonnell Douglas* burden shifting paradigm is inapplicable where there is direct evidence of discriminatory animus. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989). In the instant matter, Groff argues that there is direct evidence of discrimination, or in the alternative, that he has produced sufficient circumstantial evidence to survive summary judgment under the *McDonnell Douglas* test.

### 1. Direct Evidence

Direct evidence of discrimination takes the form of either: 1) a workplace policy that is discriminatory on its face; or 2) statements by decisionmakers that reflect the alleged animus and bear squarely on the alleged adverse employment decision. *Garcia v. Newtown Twp.*, 483 F. App'x 697, 704 (3d Cir. 2012). Evidence is only direct when it is so strong that a factfinder would have little choice but to conclude that a discriminatory attitude was, more likely than not, a motivating factor. *See Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 269 (3d Cir. 2010).

Groff does not argue that the USPS has a workplace policy that is discriminatory on its face. Rather, he focuses on the second form of direct evidence of discrimination, arguing that decisionmakers made statements that reflect alleged animus toward him.

Plaintiff's first alleged direct evidence of discrimination is Quarryville Postmaster Patricia Wright's 2015 alleged statement regarding Groff's refusal to work Sundays, "I'm not going to put up with this shit again this year." (Groff Dep., pp. 111-113; 325.) However, this statement is irrelevant to the instant allegations of discrimination, as it transpired before Groff was stationed at the Holtwood Post Office. Further, Wright is not a decisionmaker as to Groff's discipline.

Next, Plaintiff argues that in March of 2017, Christiana Postmaster Roger Sheddy was on a conference call with other postmasters and managers to discuss the Amazon contract in Lancaster County. (Sheddy Dep., ECF No. 43, Ex. A at 17.) He heard an individual who he believed was Brian Hess, Groff's postmaster, complain about someone not working Sundays due to religious observance, and assumed this statement was made in reference to Groff. (*Id.*) Sheddy stated that in response, another manager said, "oh

yeah, we're going to get him." (*Id*. at 17-19.) Sheddy then heard Mary Tyneway, the Post Office Operations Manager, state "Sunday's just another day." (*Id*. at 18.) Although it may sound nefarious, this allegation is too speculative to be the type of direct evidence that can serve as proof of discrimination. Sheddy heard someone that he **thought** was Hess complaining about someone that he **assumed** to be Groff not working on Sundays due to his religion. This allegation is rife with speculation and is insufficient to be the type of smoking gun evidence necessary to prove direct discrimination. Further, the statement of Mary Tyneway that "Sunday's just another day" makes no mention of religion, and Tyneway is also a non-decisionmaker as to Groff's discipline.

Quarryville Supervisor Sheddy felt that Groff was being treated unfairly and sent a letter reflecting these thoughts to a Post Office consultant in Washington D.C. However, Sheddy was not a decisionmaker regarding Groff's discipline and therefore, his thoughts clearly cannot be direct evidence of discrimination.

Groff also argues that Hess told him management was going to "make an example" out of him. (Groff Dep. at 231.) Hess denies that he ever made such a statement, but even if he did, it would be insufficient to serve as direct evidence of discrimination. It is clear from that record that USPS management did **not** in fact make an example of Groff. He was permitted 24 Sunday absences, three times the number that could have resulted in his termination and he was never fired. If management was looking to make an example of Groff, they could have done so after far fewer absences than 24. This alleged statement by Hess, even if true, is not the type of strong evidence that permits a plaintiff to avoid application of *McDonnell Douglas* by proving direct evidence of discrimination.

Groff also makes much of the fact that on two occasions, Postmaster Hess helped other carriers and not him, and that Hess once made a joke that hurt his feelings. First, the record shows that none of these instances had anything to do with Groff's religion. The record shows that the instances when Hess helped other RCAs and not Groff involved carriers who were new, had a large amount of mail and packages to deliver, and were overwhelmed. The record also shows that the joke Hess made that hurt Groff's feelings had nothing to do with religion and that the atmosphere at Holtwood involved lots of joking between employees, including Groff. Groff could only cite to a few minor instances in which Hess allegedly treated him poorly over two years of working at the Holtwood post office. These minor instances are insufficient to prove animus directed toward Groff on the part of Hess.

Groff makes other unavailing arguments that direct evidence of discrimination exists. Groff being "subjected" to eight (8) pre-disciplinary interviews for his failure to work on Sundays, his claim that accommodations were offered and then revoked and his claim that accommodations varied from region to region are all insufficient direct evidence of discrimination. None of these allegations, even if proven to be true, amount to enough evidence to allow a factfinder to conclude that a discriminatory attitude was, more likely than not, a motivating factor in Defendant's treatment of Groff. It is noteworthy that Groff has produced no direct evidence of animus whatsoever.

In summary, Groff has failed to produce any direct evidence that clearly shows that postal management was motivated by animus against Groff's religion. Therefore, he cannot avoid the application of the *McDonnell Douglas* burden shifting paradigm.

### 2.  *McDonnell Douglas* Analysis

To establish a *prima facie* case of religious or national origin discrimination under a disparate treatment theory when there is no direct evidence of discrimination, courts use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-05 (1973)[1]. First, the plaintiff has the burden of proving a *prima facie* case of discrimination by the preponderance of the evidence. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* at 804.

### a.  *Prima Facie* Case

To establish a *prima facie* case, the plaintiff must show: 1) he is a member of a protected class; 2) he is qualified for the position; 3) he suffered an adverse employment action; and 4) that the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as when a similarly-situated person not of the protected class is treated differently. *Abramson*, 250 F.3d at 281-82 (*citing Goosby v. Johnson & Johnson Med., Inc*., 228 F.3d 313, 318-19 (3d Cir. 2000).

Defendant admits that Groff can establish that he is a member of a protected class and is qualified for the position as issue. (ECF No. 36, p. 15.) However, Defendant

---

[1] Groff argues that the *McDonnell-Douglas* burden shifting framework is no longer applicable to disparate treatment cases after the U.S Supreme Court's decision in *EEOC v. Abercrombie & Fitch Stores, Inc*., 135 S. Ct. 2028 (2015). I find this to be incorrect. *Abercrombie* is a disparate treatment case, but it makes no mention of *McDonnell-Douglas* or "burden-shifting" anywhere in the opinion. Further, courts in this district have applied the *McDonnell Douglas* test to religious discrimination claims after *Abercrombie* was decided. *See Dinnerstein v. Burlington Cty. Coll.*, 764 F. App'x 214, 217-18 (3d Cir. 2019). Accordingly, I will apply the *McDonnell-Douglas* framework to the instant matter.

argues that Groff cannot establish the third prong of the *prima facie* case – that he suffered an adverse employment action.

An action is adverse only if it tangibly affects the terms and conditions of employment. *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 64 (2006). In support of his claim that he suffered an adverse employment action, Groff claims that he was constructively discharged. Constructive discharge requires discriminatory actions "so intolerable that a reasonable person would be forced to resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887 (3d Cir. 1984). Groff argues that he was forced to resign before Defendant fired him due to his repeated Sunday absences. Therefore, the question is whether a reasonable employee in Groff's shoes would have expected to be terminated. Groff was absent twenty-four times over a two-year period and received only a few disciplines. He lost no pay or hours because of his discipline and knew of no employee who had ever been fired for absenteeism.

However, Groff did testify that Brian Hess told him that management "intended to skip the typical early steps of disciplinary action and go directly to a suspension and subsequent termination" of his job (ECF No. 36, Ex. D, Notice of Right to File Individual Complaint), and that Supervisor Treva Morris told Groff in writing that she was considering discipline for his failure to work as scheduled and that the "corrective action may be up to and including a removal from the Postal Service." (ECF No. 37, Pl's Mtn Appendix, p. 140.) This creates a genuine issue of material fact as to whether a reasonable employee in Groff's shoes would have expected to be fired. Accordingly, I find that a genuine issue of fact exists as to whether Groff suffered an adverse employment action.

Defendant also argues Groff does not meet with fourth prong of the *prima facie* case because he cannot prove causation. A plaintiff must show some "causal nexus" between his protected status and an employment action. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003). In order to establish a *prima facie* case, Groff needs to show that Defendant's adverse employment action was motivated by an anti-religion animus. Typically, this type of causation is proven through the identification of similarly-situated employees outside of a plaintiff's protected class who received preferential treatment. In this matter, Groff has produced no evidence of causation through such comparators. There are no similarly-situated employees identified, no employees who were not religious and who were permitted be absent on certain required work days. Groff has completely failed to identify any similarly situated employees who were treated more favorably than him.

However, a plaintiff can also meet the fourth prong by showing that the circumstances of the adverse action give rise to an inference of discrimination. *Oakley v. Orthopaedic Assocs. of Allentown, Ltd.*, 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010), *citing Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 411 (3d Cir. 1999); *Parsia v. Allied Tube & Conduit Corp.,* 2009 WL 750191, at *11–12 (E.D.Pa. Mar. 19, 2009). Therefore, Groff could establish the fourth prong by showing that the circumstances of his alleged constructive discharge give rise to the inference of discrimination. Upon review of the entire record in this matter, I find that there is a genuine issue of material fact as to whether Groff could show that the circumstances of his constructive discharge suggest discrimination on the part of Defendant. Accordingly, it is possible that Groff may meet the fourth prong and therefore, be able to prove a *prima facie* case of religious

discrimination at the trial of this matter. Accordingly, I must proceed to the next step of the *McDonnell Douglas* analysis.

### b. Non-Discriminatory Explanation

As it is possible that Groff could establish a *prima facie* case of discrimination, the burden now shifts to Defendant to establish a legitimate, non-discriminatory reason for its action. *Abramson v. William Patterson Coll. of NJ,* 260 F.3d 265, 282 (3d Cir. 2001). The burden on defendants at this juncture is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Defendant can meet this burden by setting forth evidence that the Postal Service was in serious financial distress, needed Sunday Amazon delivery to be successful, and therefore needed Groff and all RCAs to be in attendance. Accordingly, the burden now shifts back to Groff to prove by a preponderance of the evidence that the legitimate reasons offered by Defendant were a pretext for discrimination.

### c. Pretext

To demonstrate pretext, a plaintiff must provide evidence either that the decision maker was motivated by animus or that shows the proffered explanation to be fabricated. *Atkinson v. Lafayette Coll.,* 460 F.3d 447, 454 (3d Cir. 2006). To prove pretext, a plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder **could** rationally find them unworthy of credence, and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765. (emphasis in original.)

To show pretext, Groff must produce evidence that he was treated differently with regards to Sundays because he was a Christian or that Defendant's explanation of the need for Amazon Sunday delivery to be successful was fabricated. He can do neither. Not one decision-maker ever made a negative comment to Groff about his religion or his observance of it. All decision-makers denied anti-religious animus, and several of them were Christian themselves. Groff cannot prove pretext by suggesting or speculating that there was anti-Christian animus in the USPS. He must prove it and he clearly has not. Similarly, there is certainly evidence that Sunday Amazon delivery was very important but challenging for Defendant, and that the USPS struggled to get RCA's to work on Sundays. There is no evidence in the record of fabrication by Defendant. Accordingly, Groff cannot prove that Defendant's reasons for his discipline were a pretext for discrimination and his disparate treatment claim must fail.

### B.  <u>FAILURE TO ACCOMMODATE</u>

Title VII failure to accommodate claims are also governed by a burden-shifting framework. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010). Under this framework, the plaintiff again has the initial burden of proving a *prima facie* case. *Id.* If he does, the burden then shifts to the employer to show either: (1) it made a good-faith effort to reasonably accommodate the plaintiff's religious belief, or (2) that such an accommodation would cause an undue hardship to the employer.

To establish a *prima facie* case of religious discrimination, the employee must show: (1) he holds a sincere religious belief that conflicts with a job requirement; (2) he informed his employer of the conflict; and (3) he was disciplined for failing to comply with the conflicting requirement. *GEO Grp,* 616 F.3d at 271, *citing Webb v. City of Phila*,

562 F.3d 256, 259 (3d Cir. 2009). The burden [then] shifts to the employer to show either [1] it made a good-faith effort to reasonably accommodate the religious belief, or [2] such an accommodation would work an undue hardship upon the employer and its business. *Id.* (citations omitted).

In the instant matter, Defendant does not argue that Groff cannot establish a *prima facie* case. Rather, Defendant argues that he has two defenses to Groff's failure to accommodate claim that cause him to prevail in this matter.

### 1. Reasonable Accommodation

Title VII does not require an employer offer every accommodation, it need only offer a reasonable accommodation. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). "Title VII does not define what is a 'reasonable accommodation,'" but the Supreme Court has "made clear" that "a sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one that the employee suggests or prefers, and it need not be the one that least burdens the employee." *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 225 (3d Cir. 2000) (citing *Ansonia Bd. of Educ.*, 479 U.S. at 68–69986)). Simply put, when the employer offers any reasonable accommodation, the statutory inquiry must end. *See id.*

Defendant argues that he accommodated Groff's religion in four ways. First, by allowing him to take another day off as a day of worship in a week when he was scheduled to work on a Sunday. Second, by allowing Groff to come in late on Sunday after church services if he was scheduled on a Sunday. Next, by excusing him from work on a Sunday if management could find coverage for Groff when he was scheduled, and lastly, by excusing Groff if he could find his own coverage for a Sunday when he was

scheduled. (ECF No. 36, p. 22.) Defendant argues that these scenarios were a reasonable accommodation, as the latter two accommodations wholly resolved the conflict between Groff's work and his religion, because if a shift swap was arranged, either by management or by Groff himself, there was no conflict.

In response, Groff claims that in order to be reasonable, an accommodation must **fully** eliminate the conflict between work and religion, and that shift swapping does not do so because if another employee does not take Groff's Sunday shift, he is not accommodated. In support of this argument, Groff relies upon a circuit split (also discussed by Defendant) as to whether an accommodation need to wholly eliminate the conflict to be reasonable. *Compare EEOC v. Firestone Fibers & Textiles Co.,* 515 F.3d 307 (4th Cir. 2008); *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1032-33 (8th Cir. 2008) *with Morrisette-Brown v. Mobile Infirmary Medical Center*, 506 F.3d 1317, 1322 (11th Cir. 2007); *Baker v. Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006); *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993). The Third Circuit has never squarely addressed this issue, but District Courts have held that an accommodation need not completely eliminate a conflict in order to be reasonable. *See Miller v. Port Auth. of N.Y. & N.J.*, 351 F.Supp.3d 762, 778 (D.N.J. 2018); *E.E.O.C. v. Aldi, Inc.*, 2008 WL 859249, at *13 (W.D. Pa. Mar. 28, 2008).

Lacking any Third Circuit authority to the contrary, I find that an employer does not need to wholly eliminate a conflict in order to offer an employee a reasonable accommodation. Accordingly, Defendant did not need to completely eliminate the conflict for its offer of accommodation to Groff to be considered reasonable. Further, *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 77-78 (1977) held that voluntary

shift swapping may be a reasonable accommodation. *See also Miller*, 351 F.Supp.3d at 781. In this matter, Defendant made accommodations, as management offered to help with shift swapping, and Groff was also permitted to arrange his own shift swaps. Groff was not happy with these accommodations, but that does not make them unreasonable. An employer is not required to offer an employee his preferred accommodation where an adequate accommodation has already been provided. *See Miller*, 351 F.Supp.3d at 778, *citing Prise v. Alderwoods Grp., Inc*., 657 F.Supp.2d 564, 601 (W.D. Pa. 2009). I find Defendant offered Groff reasonable accommodations and summary judgment should therefore be granted to Defendant on Count II of Plaintiff's Complaint.

### 2. Undue Hardship

Typically, where a reasonable accommodation is found, "the statutory inquiry is at an end." *Ansonia*, 479 U.S. at 68. However, in the alternative, I will briefly address the undue hardship that would be suffered by Defendant if Groff were permitted his desired accommodation of being skipped over in the schedule every Sunday. An employer must reasonably accommodate an employee's religious practices unless accommodation would cause an undue hardship. *TWA v. Hardison*, 432 U.S. 63, 71-72 (1977). An accommodation that imposes anything more than a *de minimus* cost on an employer causes such a hardship. *Id.* at 84. In examining an undue hardship, courts evaluate both economic and non-economic costs. *Webb v. City of Phila*., 562 F.3d 256, 259-60 (3d Cir. 2009.) "[E]mployers must be given leeway to plan their business operations and possible accommodative options in advance, relying on an accommodation's predictable consequences along the way." *Firestone Fibers & Textiles Co.*, 515 F.3d at 317*. If an accommodation would violate a CBA or impose more than a *de minimis* impact on co-

workers, "then [the employer] is not required to offer the accommodation under Title VII." *Id.* (citing *Balint v. Carson City*, 180 F.3d 1047, 1054-55 (9th Cir. 1999).

In this matter, Defendant provides evidence of multiple instances of undue hardship if Groff were given his preferred accommodation and Groff raises numerous legal arguments in an attempt to defeat that evidence. However, there is no need to examine each and every argument, as *TWA v. Hardison* clearly shows that violation of a collectively bargained agreement is an undue hardship. 432 U.S. 63, 79. In the instant matter, allowing Groff to be skipped in the schedule every Sunday would be a clear violation of the MOU. Groff knew that as an RCA, he would be a part-time carrier who covered for regular carriers when needed and that he had no contractual right to specific days off. Beginning in 2016, pursuant to the MOU, all RCAs had to be available to work weekends. On any given Sunday, pursuant to the MOU, management would first schedule assistant rural carriers, then volunteer RCAs, then non-volunteer RCAs as needed on a rotating basis. This arrangement was negotiated and agreed upon by Defendant and the union representing Groff.

Skipping Groff in the Sunday rotation and never scheduling him to work on that day of the week would clearly violate the process carefully laid out in the MOU. As a non-volunteer RCA, pursuant to the MOU, Groff had to be available if there were no ARCs or volunteer RCAs available for Sunday shifts. There was no mechanism set forth in the MOU for an RCA to be skipped over in the Sunday scheduling. The parties agree that the MOU was collectively bargained, governed RCAs and generally required RCAs to work Sundays, with only three exceptions. Those exceptions were: 1) approved leave; 2) to prevent overtime; and 3) where an RCA was on long-term assignment covering for

a full-time career carrier. Groff makes much of the "approved leave" exception, arguing that the phrase "approved leave" as used in the MOU would include religious accommodations such as the one that he sought in this matter.[2] Groff also argues that *TWA* is distinguishable because in that CBA, union employees were selected for shifts based upon seniority, and the MOU at issue here was not seniority based.

First, it is completely irrelevant that the CBA in *TWA v. Hardison* was seniority-based while the MOU in this matter is not. Both the *TWA* CBA and the MOU were bargained for by the union representing the employee and the employer. How each agreement chose to assign shifts to its employees is of no consequence. Both agreements were bargained for and agreed upon. The MOU should stand on its own and must not be violated.

Next, the phrase "approved leave" as used in the MOU is not defined in that document. However, both the Postal Service and the Union viewed this phrase to include accrued, annual leave, something Groff did not have and could not earn. Further, it strains credulity to think "approved leave" would include the type of permanent religious leave sought by Groff that would exempt him from Amazon deliveries every single Sunday. Clearly, this phrase is meant to include the type of occasional leave an employee earns and uses sporadically. Accordingly, pursuant to *TWA*, Defendant in this case has more than met the *de minimus* standard necessary to prove undue hardship, as Groff's preferred accommodation of being skipped in the schedule every single Sunday would violate the MOU.

---

[2] Groff does not argue that he should have been permitted to use leave such as vacation time as part of the "approved leave" exception in the MOU, as RCAs did not earn and cannot use leave. (Groff Dep. at 148.)

Further, even if the MOU did not exist, Defendant has identified multiple other hardships that would easily meet the *de minimus* standard necessary to prove an undue hardship. Of particular note would be the impact on the Holtwood Post Office. There were times during Groff's employment that the Holtwood station only had two RCAs, one being Groff. If Defendant passed over Groff in the schedule every Sunday, the other RCA in Holtwood would be required to work every single Sunday without a break. Many courts have recognized that an accommodation that causes more than a *de minimus* impact on co-workers creates an undue hardship. *See Miller*, 351 F.Supp.3d at 789; *see also Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) (providing postal worker with Saturdays off would have burdened co-workers with more weekend work); *Aron v. Quest Diagnostics, Inc.,* 2005 WL 1541060, at *1 (D.N.J. June 30, 2005) (granting summary judgment for employer where plaintiff, who was not hired as phlebotomist which required two Saturday shifts per month, because accommodation would have created undue burden on existing employees to work more Saturdays), *aff'd*, 174 Fed. App'x 82, 83 (3d Cir.) (recognizing that proposed accommodation would constitute undue hardship, in part, because it "would result in unequal treatment of the other employees and negatively affect employee morale."), *cert. denied*, 549 U.S. 973, 127 S.Ct. 393 (2006); *Lee v. ABF Freight System, Inc.*, 22 F.3d 1019, 1022-24 (10th Cir. 1994) (noting that employer is not required to assign another employee to perform plaintiffs duties, which would have resulted in alteration of employees' time off); *Prise*, 657 F.Supp.2d at 599-600 (stating that "courts have consistently held that Title VII does not require an employer to force other employees to work on a particular day in order to accommodate a specific employee's desire to observe a religious holiday or

Sabbath"); *Sanchez-Rodriguez v. AT&T Wireless*, 728 F.Supp.2d 31, 43-44 (D.P.R. Aug. 5, 2010) (finding that proposed accommodation "to disrupt ... neutral scheduling system" and give Sabbath employee every Saturday off would be undue burden because other employees would have to cover plaintiffs Saturday shift); *Vaughn v. Waffle House, Inc.*, 263 F.Supp.2d 1075, 1085 (N.D. Tex. 2003) (holding that "Title VII does not require an employer to impose additional responsibilities on an employee's coworkers in accommodating that employee's religious beliefs" by requiring other employees to work employee's weekend shift). The impact that would be felt by the other RCA at the Holtwood post office if Groff was permitted to be skipped in the schedule every Sunday would clearly be more than *de minimus*, and Defendant meets its burden of proving undue hardship.

Therefore, even if Defendant did not make a reasonable accommodation to Groff by allowing shift-swapping, his claim of discrimination still must fail because Defendant has demonstrated undue hardship. Summary judgment in favor of Defendant is warranted on Count II of Plaintiff's Complaint.[3]

Groff also filed a Motion for Partial Summary Judgment in this matter, seeking an entry of judgment on Count II of his Complaint. As discussed above, I find both that Defendant offered Groff a reasonable accommodation, and that Defendant would suffer

---

[3] Defendant makes much of the fact that Defendant's 30(b)(6) corporate designee could not identify the hardship that was caused to the Postal Service by skipping Groff in the Sunday schedule. However, I find this argument to be irrelevant, as the mere fact that skipping Groff in the rotation would violate the MOU is sufficient to prove undue hardship. Further, there was extensive evidence put forth by Defendant as to the effect allowing Groff to skip Sundays would have on his co-workers, which has also been held to be an undue hardship.

undue hardship if Groff was permitted to skip Sunday shifts. Accordingly, Groff's motion for summary judgment on Count II of his Complaint is denied.[4]

## V.      **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted, Plaintiff's Partial Motion for Summary Judgment is denied, and Plaintiff's Complaint is dismissed. An appropriate order follows.

---

[4] Groff also filed a Motion for Sanctions seeking to strike Defendant's undue hardship affirmative defense from his Answer to the Complaint due to alleged discovery abuses. This request is neither supported by the facts of record nor the Rules of Civil Procedure and is therefore denied.