IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD E. GROFF,

      Plaintiff,

    v.

LOUIS DEJOY, POSTMASTER
GENERAL, UNITED STATES POSTAL
SERVICE,

      Defendant.

Case No. 5:19-cv-1879

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In the nearly three years since this Court last granted summary judgment in favor of Defendant Louis DeJoy, Postmaster General of the United States Postal Service, nothing has substantially changed about the law or the facts. The Supreme Court clarified but did not overturn its holding in *TWA v. Hardison*, 432 U.S. 63 (1977). Under that holding and the Supreme Court's clarification, summary judgment should again be granted for DeJoy under Federal Rule of Civil Procedure 56. The grounds for this motion are detailed in the accompanying memorandum of law.

Dated:  January 16, 2024

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Susan R. Becker for GBD*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*/s/ Gregory B. in den Berken*
Gregory B. in den Berken
Fernando I. Rivera
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:      (215) 861-8200
Email:      gregory.indenberken@usdoj.gov
            fernando.rivera@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD E. GROFF,

      Plaintiff,

  v.

LOUIS DEJOY, POSTMASTER
GENERAL, UNITED STATES POSTAL
SERVICE,

      Defendant.

Case No. 5:19-cv-1879

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.     Facts .................................................................................................... 2

II.    Procedural History ............................................................................ 10

LEGAL STANDARD ........................................................................................ 13

ARGUMENT .................................................................................................... 14

I.     The Supreme Court's Decision Clarified the Undue-Hardship Standard
       Without Overruling *Hardison*'s Core Holding ................................. 15

II.    The Record Establishes USPS's Undue-Hardship Defense ............ 16

       A.    USPS would suffer an undue hardship under the Supreme Court's
             clarified standard. ................................................................... 16

       B.    USPS would suffer an undue hardship under *Hardison*. ...... 20

CONCLUSION ................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................. 13

*Bushra v. Main Line Health, Inc.,*
   No. 23-cv-1090, 2023 WL 9005584 (E.D. Pa. Dec. 28, 2023) ................................. 17

*Celotex Corp v. Catrett,*
   477 U.S. 317 (1986) ................................................................................. 14

*Daniels v. Sch. Dist. of Philadelphia,*
   776 F.3d 181 (3d Cir. 2015) ......................................................................... 14

*EEOC v. GEO Grp., Inc.,*
   616 F.3d 265 (3d Cir. 2010) ......................................................................... 14

*Groff v. DeJoy,*
   No. 19-cv-1879, 2021 WL 1264030 (E.D. Pa. Apr. 6, 2021) ........................... *passim*

*Groff v. DeJoy,*
   35 F.4th 162 (3d Cir. 2022) ................................................................. 1, 12

*Groff v. DeJoy,*
   600 U.S. 447 (2023) ......................................................................... *passim*

*Halsey v. Pfeiffer,*
   750 F.3d 273 (3d Cir. 2014) ......................................................................... 13

*Methode Elecs., Inc. v. Elco Corp.,*
   385 F.2d 138 (3d Cir. 1967) ......................................................................... 14

*Miller v. Port Auth. of N.Y. & N.J.,*
   351 F. Supp. 3d 762 (D.N.J. 2018), *aff'd*, 788 F. App'x 886 (3d Cir. 2019) ........... 22

*Sanchez-Rodriguez v. AT&T Wireless,*
   728 F. Supp. 2d 31 (D.P.R. 2010) .................................................................. 22

*Selective Ins. Co. of Am. v. Novitsky,*
   796 F. App'x 100 (3d Cir. 2020) ................................................................... 14

*Sloan & Co. v. Liberty Mut. Ins. Co.,*
   653 F.3d 175 (3d Cir. 2011) ......................................................................... 14

**Page(s)**

*TWA v. Hardison,*
  432 U.S. 63 (1977) ............................................................................ *passim*

*Webb v. City of Philadelphia,*
  562 F.3d 256 (3d Cir. 2009).......................................................... 17

**STATUTES**

42 U.S.C. § 2000e(j) ..................................................................... 15

**RULES**

Federal Rule of Civil Procedure 56(a)........................................ 13

**INTRODUCTION**

More than 45 years ago, the Supreme Court in *TWA v. Hardison* held that Title VII requires a balance between an employer and an employee who is seeking a religious accommodation. 432 U.S. 63 (1977). Where the accommodation would impose an undue hardship, considering both economic and non-economic costs, the employer may deny the accommodation. Among the non-economic costs to be considered is whether granting the request would violate a collective-bargaining agreement or other contract.

Under this standard, this Court in 2021 granted summary judgment in favor of Louis DeJoy, Postmaster General of the United States Postal Service ("USPS"). *Groff v. DeJoy*, No. 19-cv-1879, 2021 WL 1264030 (E.D. Pa. Apr. 6, 2021). This Court's grant of summary judgment was affirmed on appeal. *Groff v. DeJoy*, 35 F.4th 162 (3d Cir. 2022).

Gerald Groff appealed to the Supreme Court of the United States seeking to overturn *Hardison*. He was unsuccessful. This past June, the Supreme Court issued its decision clarifying some imprecise language in *Hardison* but changing none of its core holdings. *Groff v. DeJoy*, 600 U.S. 447 (2023). While affirming that *Hardison* remains good law, the Supreme Court explained that although the *Hardison* court had in passing used the language "more than . . . *de minimis*" in describing the undue-hardship standard, the actual standard is "substantial" rather than merely "*de minimis*."

Groff's failure-to-accommodate claim (the only one that he appealed) is now back before this Court. And the same outcome is appropriate now as was

appropriate three years ago—summary judgment in favor of USPS. When this Court evaluated summary judgment back in 2021, it relied on *Hardison*'s core holdings and not the imprecise language recently clarified by the Supreme Court. Indeed, this Court did not find a mere *de minimis* hardship for USPS in accommodating Groff—it found a substantial hardship. This Court's 2021 opinion rightly concluded that accommodating Groff's desire to be bypassed every Sunday like he requested would have caused USPS substantial hardship for numerous reasons, including because it would cause significant negative effects on USPS's business and would require USPS to violate the collective-bargaining agreement with the National Rural Letter Carriers' Association (the "Union").

As explained below, this Court's analysis, conclusions, and holding remain spot on. This was never a case about a mere *de minimis* hardship. The record has always established and continues to establish that allowing Groff to be exempted from Sunday work would cause USPS to suffer undue hardship. Summary judgment should thus be granted in favor of USPS.

## BACKGROUND

### I. Facts

#### *Groff's employment history, including his selection as an RCA*

Groff is an Evangelical Christian. Joint Stip. of Undisputed Facts ("JF") ¶ 2. In 2010, he applied for a part-time, flexible position with USPS. Def.'s Statement of Material Facts ("DF") ¶ 11. He was hired on November 20, 2010, and worked for less than a year before resigning in 2011. *Id.* Six months later, he changed his mind,

re-applied, and was re-hired. DF ¶ 12. He became a Rural Carrier Associate (an "RCA") on July 12, 2012. *Id.*

RCAs are responsible for the safe and efficient delivery and collection of the mail, working part-time to cover for regular rural carriers. JF ¶ 5; DF ¶ 14. Work hours vary depending on office and routes. DF ¶ 14. As flexible, relief carriers, all RCAs must be willing to work weekends and holidays. *Id.* They have no contractual right to specific days off. JF ¶ 45.

RCAs are guaranteed neither specific hours nor set schedules. DF ¶ 15. They do not generally earn "leave" or time off. *Id.* They are scheduled on an as-needed basis. *Id.* Beginning in 2016, all RCAs had to be available to work on Sundays. DF ¶ 19.

### *Under financial stress, USPS contracts for Sunday Amazon delivery*

In the years leading up to the events underlying this case, USPS had suffered increasingly substantial financial losses. DF ¶ 16. As a result, in an effort to improve its dire financial situation, USPS in 2013 agreed to deliver Amazon packages on Sundays. DF ¶ 17. Sunday Amazon delivery was implemented on a rolling basis. *Id.* When USPS contracted with Amazon, it was critically important to USPS that Amazon delivery be successful. DF ¶ 18.

In 2015, Groff was working in the Quarryville, Pennsylvania station when Sunday Amazon delivery rolled out to that station. DF ¶ 26. The Quarryville station is a relatively large station with roughly a dozen carriers and 10 mail routes. DF ¶ 27. Groff negotiated with his then-postmaster, Patricia Wright, to be exempt from working on Sundays. DF ¶ 28. In 2015, such a decision was within the discretion of

the postmaster and the Quarryville station's large number of carriers afforded Postmaster Wright some flexibility. DF ¶ 29. Beginning in 2016, however, all RCAs had to be available to work on Sundays and Postmaster Wright informed Groff that she could no longer exempt him going forward. DF ¶¶ 19, 30. Groff filed no grievance or employment-discrimination complaint. DF ¶ 31. Instead, he voluntarily transferred to the Holtwood, Pennsylvania station effective August 20, 2016. *Id.*

The Holtwood station was a much smaller operation than the Quarryville station. DF ¶ 32. It had only three full-time regular rural carriers and three relief carriers to cover three mail routes. *Id.* When Groff transferred to the Holtwood station, there was no Sunday delivery at that station yet. JF ¶ 15. No one, including Holtwood Postmaster Brian Hess, ever promised Groff that either Groff or the station would continue to be excluded from Sunday Amazon delivery. *Id.*

Postmaster Hess was aware that Groff had religious objections to working on Sunday. JF ¶ 14. Postmaster Hess was also a Christian and himself attended church on Sundays. DF ¶ 38. When Groff first transferred to Holtwood, he got along well with Postmaster Hess. JF ¶ 17.

### *The process for Sunday Amazon delivery is formalized by agreement with the Union*

As Sunday Amazon delivery rolled out nationwide, USPS formalized the processes for the initiative. DF ¶ 21. On May 24, 2016, the Union (which represents rural carriers, including RCAs) entered into an agreement with USPS known as a Memorandum of Understanding (the "MOU"). JF ¶ 8. The MOU set forth the formal process for scheduling employees for Sunday Amazon delivery. DF ¶ 20.

4

Pursuant to the MOU, USPS created two lists of carriers. JF ¶ 9. Every part-time rural carrier, which includes RCAs, was asked whether he or she wanted to work every Sunday and holiday ("volunteers") instead of being on a regular rotation ("non-volunteers"). *Id.* On any given Sunday or holiday, management determined how many carriers needed to be scheduled given the expected mail volume. JF ¶ 10. Management first scheduled assistant rural carriers ("ARCs")—part-time carriers whose sole job is to work on Sundays and holidays—then scheduled volunteer part-time carriers like RCAs, then scheduled non-volunteer part-time carriers as needed, on a rotating basis. *Id.*; DF ¶¶ 22-23. So, pursuant to the MOU, all RCAs had to be available to work on Sundays. JF ¶ 40. This was part of their job. *Id.*; DF ¶ 19. The MOU specified that an RCA could be temporarily bypassed in the rotation only in limited circumstances. JF ¶ 11; DF ¶ 24. RCAs would be bypassed if they had approved leave or a non-scheduled day adjacent to that Sunday. JF ¶ 11; DF ¶ 24. And managers were permitted to bypass an RCA if scheduling them would result in the RCA exceeding 40 hours at the end of the work week. JF ¶ 11; DF ¶ 24. There was no exception for an RCA who wanted every Sunday off due to a religious objection to working on Sundays. JF ¶ 11; DF ¶ 24.

Sunday Amazon delivery was handled differently during "peak" (November to January) and "non-peak" seasons. JF ¶ 42. During non-peak season, RCAs and other part-time rural carriers from across the district reported to the Lancaster Carrier Annex. JF ¶ 43. Management from the Annex created the schedule and directed the carriers as they delivered from this central location in the district. *Id.*

During peak season, each station scheduled its own carriers who reported to and delivered packages from that station. JF ¶ 44.

When Amazon Sunday Delivery began rolling out, a total of 31 stations in central Pennsylvania reported to the Lancaster Carrier Annex. DF ¶ 42. These stations were located across a geographically large territory, spanning approximately 550 square miles. *Id.* USPS thus had only limited stations from which it could draw RCAs for Sunday Amazon Delivery in the region. USPS struggled to staff Sunday shifts in the central Pennsylvania region due to a severe shortage of RCAs (459 short in central Pennsylvania). DF ¶ 52. There were attendance issues with scheduled RCAs simply not showing up. DF¶¶ 49, 51. And despite continuously trying, USPS had significant difficulties hiring (and retaining) RCAs for Sunday Amazon delivery. DF ¶¶ 51-53.

### *Sunday Amazon delivery rolls out to the Holtwood station*

Sunday Amazon delivery rolled out to the Holtwood station in March 2017. JF ¶¶ 16, 18. In response, Groff told Postmaster Hess that he would resign. DF ¶ 40. Postmaster Hess respected Groff's religious convictions and told Groff that he was sorry to lose a good employee. *Id.* But Groff did not actually resign at this time. JF ¶ 38.

### *USPS's efforts to accommodate Groff*

Holtwood part-time rural carriers were first scheduled for Sunday Amazon delivery on March 19, 2017. JF ¶ 16. Groff was scheduled to work that day. *Id.* In total, between March 19, 2017 (when Sunday Amazon delivery came to Holtwood)

and January 18, 2019 (when Groff resigned), Groff was scheduled to work at least 24 Sundays. JF ¶ 23. He never worked a single one. JF ¶ 21.

Recognizing the conflict between Groff's stated religious beliefs and the requirements of the RCA position, USPS offered him several options. JF ¶ 22. First, if Groff was scheduled on a Sunday, he could take another day off that week as a day of worship. JF ¶¶ 22, 31. Second, if Groff was scheduled on a Sunday, he could come in later that day, after attending church. JF ¶ 22. Third, management would contact other stations to find coverage for Groff on the Sundays when he was scheduled. *Id.* Fourth, within reason, Groff could find his own coverage if he was scheduled on Sunday. DF ¶ 44. If coverage was found, Groff would be excused from working on that particular Sunday. JF ¶ 22.

Groff rejected these offers. DF ¶ 47. But he did not quit or seek another position that did not require Sunday work. Instead, Groff demanded to be completely excused from working on Sundays. *Id.* In other words, Groff wanted USPS to create an idiosyncratic position for him that was different from every other RCA position. All RCA positions required Sunday work. JF ¶ 40. Groff knew this from at least early 2016. DF ¶ 30.

Although Groff refused USPS's offered accommodations, Postmaster Hess nonetheless diligently looked for substitute carriers for Groff each week that Groff was scheduled to work on Sunday. DF ¶¶ 49, 61. Postmaster Hess was sometimes able to find overage for Groff, but it was a time-consuming process. DF ¶ 49. Groff was not the only RCA who objected to Sunday work. *Id.*

Postmaster Hess convinced several RCAs to cover for Groff. DF ¶ 62. RCA Justin Tekely, who was a Christian and wanted Sundays off to attend church, covered Sundays for Groff during the entire 2017 peak season. *Id.* RCA Valerie Gustavsen covered for Groff during the entire 2018 peak season. *Id.* Postmaster Hess also arranged for RCA Lori Lewis to cover for Groff. *Id.*

Hess was not always able to find another RCA to cover for Groff. DF ¶ 61. Pursuant to the collective-bargaining agreement ("CBA") between USPS and the National Rural Letter Carriers' Association, full-time regular rural carriers were classified as career employees and exempt from working on Sundays. DF ¶ 25. So Hess could not force any of Holtwood's regular rural carriers to cover for Groff. *Id.* Regular rural carriers had seniority rights over RCAs like Groff. *Id.*

Nor was Hess, a manager, permitted to deliver the mail. DF ¶ 59. Doing so violated the CBA provisions specifying the permissible work for supervisors. *Id.* If a rural carrier learned that management was delivering the mail, that carrier could file a grievance seeking reimbursement for the hours of mail delivery improperly taken by management. *Id.* Despite this fact, out of desperation, Postmaster Hess sometimes violated the CBA and personally delivered packages to cover for Groff. *Id.* The alternative was to risk curtailed mail (packages left behind in the station to be delivered on Monday) which could cause safety issues and cause USPS to fail to meet the delivery targets that it promised Amazon. *See id.*

### USPS's progressive discipline system

Groff understood that, like any other employee, he could be disciplined for absenteeism. DF ¶ 67. USPS uses a "progressive" system of discipline: first a letter

of warning; followed by a seven-day suspension; followed by a fourteen-day suspension; followed by possible termination. JF ¶ 25. "Paper suspensions," like the ones issued to Groff, do not cause an employee to lose work or pay. JF ¶ 26. Generally, an employee may be disciplined for every two-to-three absences. DF ¶ 71.

Many RCAs objected to working on Sundays. DF ¶¶ 49, 51. In fact, following the rollout of Sunday Amazon delivery, many quit. DF ¶ 51. Others simply failed to report when scheduled. DF ¶¶ 49, 51. RCAs who were absent when scheduled, regardless of the reason, were disciplined. DF ¶ 67.

### *Groff's absences and resulting discipline*

Groff was scheduled to work on six out of ten Sundays from March 19, 2017 through May 21, 2017. JF ¶ 23. He did not work any of those Sundays, and management issued a letter of warning to Groff on June 9, 2017. JF¶ 21; DF¶ 73. Groff was then scheduled to work on 10 out of the 27 Sundays from June 11, 2017 through December 17, 2017, and did not show up for work on any of those Sundays. JF ¶¶ 23-24. Management issued a seven-day paper suspension to Groff dated January 2, 2018. JF ¶ 33. Groff was then scheduled to work on 8 out of the 18 Sundays from January 14, 2018, through May 13, 2018, and was absent from all. JF¶¶ 23-24. Groff thus was issued a fourteen-day paper suspension dated October 5, 2018. JF ¶¶ 23, 36.

### *Groff's absenteeism negatively impacts USPS*

Implementing and executing Sunday Amazon delivery was a significant effort and required substantial work. DF ¶ 50. It was difficult to get carriers to work on Sunday. DF ¶¶ 49, 51. Without sufficient carriers, it sometimes took 15 or 16 hours

to get the packages delivered. DF ¶ 51. This meant long days and dangerous conditions for the carriers delivering in the dark. *See id.*

Groff's absence complicated the scheduling and planning processes. DF ¶ 55. Postmaster Hess had to spend time calling or emailing other stations to find coverage for Groff. DF ¶¶ 49, 61.

Skipping Groff in the rotation meant that other part-time rural carriers had to work more Sundays than they otherwise would have had to work. DF ¶ 57. When Groff was absent, other carriers were upset. DF ¶ 54. They complained. *Id.* There was even talk of a boycott among the RCAs. *Id.* One carrier filed a grievance. *Id.* After reviewing the grievance, the Union agreed with this carrier that exempting Groff from Sunday work would violate the MOU. *Id.* Another carrier simply resigned. *Id.*

Groff's absenteeism caused overtime. DF ¶ 58. Given how few RCAs were assigned to the Holtwood station, Postmaster Hess had limited options during peak season. DF ¶ 65. Toward the end of Groff's tenure, the station had only two RCAs— Groff and RCA Tekely. *Id.* Because Groff refused to work on Sundays, Tekely had to work every Sunday. *Id.* Tekely transferred from the Holtwood station because of Groff's absenteeism. DF ¶ 54. Postmaster Hess sought volunteers from other post offices to cover Groff's absence. DF ¶ 49. He often was unable to find volunteers. DF ¶ 61.

## II.   Procedural History

On May 1, 2019, Groff filed this case against the Postmaster General. *See* ECF No. 1. He asserted two claims for religious discrimination—one for alleged

disparate treatment and one for alleged failure to accommodate his religious observance. *See* ECF No. 7 (amended complaint). On April 6, 2021, this Court granted USPS's motion for summary judgment on both claims. *Groff*, 2021 WL 1264030, at *13.

The Court concluded that Groff's disparate-treatment claim failed because even if he could make out a *prima facie* case, there was no evidence that USPS's reasons for disciplining Groff were pretextual. *Id.* at *9. And the Court concluded that Groff's failure-to-accommodate claim failed for two reasons: (1) USPS offered Groff a reasonable accommodation in the form of shift swaps, and (2) USPS would suffer undue hardship if Groff were permitted to skip his Sunday shifts. *Id.* at *10-13. The Court observed that USPS had "identified multiple . . . hardships that would easily meet the *de minimis* standard necessary to prove an undue hardship," including "the impact on the Holtwood Post Office" from skipping Groff in the Sunday rotation and "the effect" that "allowing Groff to skip Sundays would have on his co-workers." *Id.* at *12 & n.3 (cleaned up). Ultimately, the Court concluded that the demonstrated hardship proven by USPS showed far greater hardship than merely *de minimis* hardship.

In addition to other evidence of hardship, the Court found an independent substantial undue hardship from the fact that skipping Groff in the rotation every Sunday would cause a violation of the MOU. *Id.* In particular, the Court recognized that "allowing Groff to be skipped in the schedule every Sunday would be a clear

violation of the MOU," *id.* at *11, which was independently "sufficient to prove undue hardship," *id.* at *12 n.3.

Groff appealed summary judgment on the failure-to-accommodate claim to the Third Circuit, which affirmed. *See Groff*, 35 F.4th 162. The Third Circuit agreed that exempting Groff from Sunday work would have imposed an undue hardship on USPS's operations because "[t]he impact on the workplace . . . far surpasses a de minimis burden." *Id.* at 174 n.18. And the Court recognized that Groff's repeated Sunday absences had "actually imposed on his co-workers, disrupted the workplace and workflow, and diminished employee morale." *Id.* at 175. As the Third Circuit observed, Groff's absences "placed a great strain on the Holtwood Post Office personnel and even resulted in the Postmaster delivering mail." *Id.* Groff's absences "also had an impact on operations and morale," "made timely delivery more difficult," and required other carriers "to deliver more mail." *Id.*

Groff sought review before the Supreme Court, which ultimately vacated and remanded. *See Groff*, 600 U.S. 447. The Supreme Court noted that some lower courts had become overly fixated on *Hardison*'s language stating that any effort or cost that is "more than . . . *de minimis*" qualifies as "an undue hardship." *Id.* at 468. The Supreme Court determined that a myopic focus on this one phrase was a "mistaken view of *Hardison*'s holding." *Id.* at 472. The Court concluded that "showing 'more than a *de minimis*' cost, as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII" because "*Hardison* cannot be reduced to that one phrase." *Id.* at 468. Rather, to establish undue

12

hardship "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470 (citing *Hardison*, 432 U.S. at 83 n.14).

Because this Court and the Third Circuit had cited *Hardison*'s "*de minimis*" language, the Supreme Court vacated and remanded the case for resolution of Groff's failure-to-accommodate claim "[w]ithout foreclosing the possibility that USPS will prevail" on remand. *Id.* at 473. The Supreme Court did not conclude that this Court improperly applied the *Hardison* standard in the first instance. Nor did the Supreme Court conclude that the evidence provided to this Court, including the violations of the CBA, would be insufficient to meet the *Hardison* standard.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) instructs that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it might affect the outcome of the case, and a dispute is "genuine" if there is evidence cutting both ways such that a reasonable jury could resolve the issue in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing motions for summary judgment, the facts are viewed in the light most favorable to the non-movant and all reasonable inferences are drawn in the non-movant's favor. *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). But "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Id.* (citation omitted).

The non-movant must present more than a mere scintilla of evidence. To preclude summary judgment, there must be evidence that could allow a jury to reasonably find for the non-movant. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015). But the movant is also "entitled to judgment as a matter of law" if the non-movant "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). And if the parties "do not contest any facts and the case deals only with legal questions," a court properly resolves the case through summary judgment. *Selective Ins. Co. of Am. v. Novitsky*, 796 F. App'x 100, 102 n.2 (3d Cir. 2020) (citing *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 179 (3d Cir. 2011)); *see also Methode Elecs., Inc. v. Elco Corp.*, 385 F.2d 138, 139 (3d Cir. 1967) (summary judgment is appropriate "when there is no genuine issue of material fact and only legal questions are to be resolved").

## ARGUMENT

Under Title VII, claims for failure to accommodate are governed by a burden-shifting framework under which the employee has the initial burden of proving a *prima facie* case.[1] *See EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010). Once the employee does so, the burden shifts to the employer to show either: (1) that it made a good-faith effort to reasonably accommodate the employee's religious observance; or (2) that it cannot reasonably accommodate the religious

---

[1]   For purposes of this motion only, USPS does not contest that Groff could establish a *prima facie* case for failure to accommodate.

observance "without undue hardship on the conduct of the employer's business." 42
U.S.C. § 2000e(j).

Here, summary judgment for USPS is warranted because Groff's desired
accommodation of skipping all Sunday work—the only accommodation that would
eliminate the asserted conflict with his religious practice—would impose an undue
hardship on USPS.

## I.    The Supreme Court's Decision Clarified the Undue-Hardship Standard Without Overruling *Hardison*'s Core Holding

As explained above, some courts read *Hardison* to hold that any cost more
than "*de minimis*" qualifies as "an undue hardship." *See Groff*, 600 U.S. at 453. The
Supreme Court's opinion in this case explained that this narrow interpretation was
a "mistake," and proceeded to "explain the contours of *Hardison*" and offer
"clarifications" on the undue-hardship requirement. *Id.* at 453, 456-57. The Court
concluded that "showing 'more than a *de minimis* cost,' as that phrase is used in
common parlance, does not suffice to establish 'undue hardship' under Title VII"
because "*Hardison* cannot be reduced to that one phrase." *Id.* at 468.

*Hardison* principally addressed the interplay between Title VII's duty to
accommodate religious practices on the one hand and CBAs and seniority rights on
the other hand. *See* 432 U.S. at 79-85. In *Hardison*, the Court concluded that Title
VII does not require an employer to "deprive [employees] of their contractual
rights[] in order to accommodate or prefer the religious needs of others." *Id.* at 81.
Title VII's "duty to accommodate" thus does not require an employer "to take steps
inconsistent with [an] otherwise valid agreement." *Id.* at 79. Crucially, the Supreme

15

Court's decision in this case did nothing to abrogate these aspects of *Hardison*. In fact, the Court disclaimed that it was overruling *Hardison*. *Groff*, 600 U.S. at 467; *see also id.* at 474 (Sotomayor, J., concurring) (observing that the Court did not overrule *Hardison*).

To be sure, the Court clarified the undue-hardship standard: "it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470 (citing *Hardison*, 432 U.S. at 83 n.14). As the Court explained, this inquiry requires scrutinizing "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost" of the employer. *Id.* (cleaned up). Ultimately, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.* at 471. But nothing in the Court's decision abrogated the other aspects of *Hardison*, including that Title VII's "duty to accommodate" does not require an employer "to take steps inconsistent with [an] otherwise valid agreement." 432 U.S. at 79.

## II.   The Record Establishes USPS's Undue-Hardship Defense

### A.   USPS would suffer an undue hardship under the Supreme Court's clarified standard.

Under the Supreme Court's clarified standard, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470.

This requires scrutiny of all relevant factors, including economic and non-economic costs[2] as well as the practical impact of the accommodation on the employer's business. *See id.*

As this Court observed in its 2021 opinion, the accommodation that Groff sought—to be completely exempted from all Sunday work—imposed numerous costs on USPS. Most notably, exempting Groff from Sunday work substantially impaired the efficiency of the Holtwood station. The Holtwood station was small and, when fully staffed, had only three RCAs (including Groff). DF ¶ 32. During peak season, Groff's absenteeism meant that the other two RCAs had to cover every Sunday. DF ¶¶ 32, 41, 54, 57. During 2017's peak season, there was only one other RCA at Holtwood in addition to Groff. DF ¶ 65. As a result of Groff's absenteeism, that other RCA—Justin Tekely—had to work every Sunday. DF ¶ 62. Tekely thought this was unfair and eventually transferred because of the strain. DF ¶ 54. And the other RCAs worked more Sundays (in addition to their other shifts) because of Groff's absences, which inevitably led to overtime. DF ¶¶ 57-58; *see also Groff*, 2021 WL 1264030, at *12 n.3 (this Court observing that "there was extensive evidence

---

[2]    That non-economic costs can be considered in the undue-hardship analysis was already settled law before the Supreme Court's decision in this case. *See, e.g.*, *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009) ("Both economic and non-economic costs can pose an undue hardship upon employers."). Since the Supreme Court's decision in this case, courts have concluded that consideration of non-economic costs remains appropriate because this "comports with the Supreme Court's emphasis on a context-specific inquiry of 'undue hardship.'" *Bushra v. Main Line Health, Inc.*, No. 23-cv-1090, 2023 WL 9005584, at *7 (E.D. Pa. Dec. 28, 2023).

put forth by [USPS] as to the effect [that] allowing Groff to skip Sundays would have on his co-workers").

Groff's absence on Sundays when he was scheduled to work delayed the timely delivery of packages and complicated scheduling and planning. DF ¶¶ 55-56. On several occasions, Groff skipping his Sunday shifts left Holtwood station with *no* RCAs—forcing Postmaster Hess to deliver the packages himself (in violation of the CBA). DF ¶ 59. On those occasions, Groff's absences exposed USPS to grievances that could have resulted in an award of damages to carriers.

Hess was caught in a double bind, because the MOU and CBA barred a variety of options. For example, if Hess compelled a regular full-time rural carrier to work on Sunday, he violated the CBA and exposed USPS to a grievance. DF ¶ 25. If Hess himself delivered the mail, he also violated the CBA and exposed USPS to a grievance. DF ¶ 59.

If Hess forced the only other RCA to work, he exposed that RCA to both burnout (15-, 16-hour days) and increased danger during delivery. DF ¶¶ 51, 56-58. This also increased overtime costs. DF ¶ 58. Hess often could not find coverage from other stations in the same geographic area. DF ¶ 61. And USPS was already trying, unsuccessfully, to hire RCAs. DF ¶ 53.

Groff was also not the only RCA within USPS with objections to working on Sundays and Hess was not the only Postmaster to find himself with limited options. DF ¶¶ 49, 51. At the time, USPS struggled to hire sufficient employees and could not risk further alienating or losing the employees that it had. DF ¶¶ 52-53.

18

The dilemma facing Hess and other similarly situated managers also posed a significant threat to USPS's business. In the years leading up to the Amazon contract, USPS had suffered staggering financial losses. DF ¶ 16. It was "critically important" to USPS that its Sunday Amazon delivery program be successful. DF ¶ 18. RCAs played a crucial role in ensuring that Sunday delivery demands are met. RCAs fill in on delivery routes as needed, which by definition means that the job requires flexibility and weekend availability, particularly in small stations lacking ARCs. JF ¶ 5; DF ¶¶ 13-14.

USPS struggled to staff Sunday shifts in the central Pennsylvania region due to a severe shortage of RCAs, which was exacerbated by RCAs resigning to avoid Sunday delivery obligations. DF ¶¶ 51-52. The shortage of RCAs to handle Sunday delivery was especially dire at the Holtwood station, and Groff's absenteeism exacerbated the problem. Indeed, USPS was "459 RCAs short in Central Pennsylvania" alone. DF¶ 52; *cf. Groff*, 2021 WL 1264030, at *9 ("there is certainly evidence that Sunday Amazon delivery was very important but challenging for [USPS], and that the USPS struggled to get RCA[]s to work on Sundays").

Groff's requested accommodation also had detrimental effects on his co-workers. As detailed above, Groff's refusal to work Sunday shifts prompted one carrier to transfer out of the Holtwood station. DF ¶ 54. Another carrier resigned in part because of Groff's failure to show up for Sunday shifts. *Id.* One carrier filed a grievance against USPS for Groff's violation of the MOU, and there were frequent complaints and even mention of a boycott. *Id.* The record thus reflects that Groff's

proposed accommodation of continued absenteeism would lead to shorthanded staff, challenges with timely deliveries, and difficulties in retaining employees. *See* DF ¶¶ 51-57. There is no indication that these issues were animated by religious animosity, and the evidence confirms that these issues detrimentally "affect[ed] the conduct" of USPS's business. *Groff*, 600 U.S. at 473.[3]

### B.    USPS would suffer an undue hardship under *Hardison*.

Undue hardship is independently satisfied here under *Hardison*'s core holding that Title VII's "duty to accommodate" does not require an employer "to take steps inconsistent with [an] otherwise valid agreement." 432 U.S. at 79. Here, Groff's requested accommodation required USPS to breach its MOU with the Union and threatened several other contractual violations. That means undue hardship is independently satisfied under *Hardison*'s core holding.

Exempting Groff from Sunday work flouted the MOU between USPS and the Union. The MOU required USPS to assign Sunday work to part-time rural carriers

---

[3]    The Supreme Court's decision concluded by observing that if an employer determines that a requested accommodation would cause an undue hardship, the employer cannot simply throw in the towel but must also consider whether other options offer a workable accommodation. *See Groff*, 600 U.S. at 473 ("Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary."). Here, the record confirms that USPS considered and offered Groff several alternative accommodations, *see* JF ¶¶ 21-22; DF ¶ 44—but the only one that would completely eliminate his asserted religious conflict is the accommodation at issue here, namely skipping all Sunday work. So the Supreme Court's requirement that the employer consider alternatives is inapposite here, and satisfied in any event.

like Groff "on a rotating basis" from a list arranged in alphabetical order once the lists of volunteers and ARCs were exhausted. JF ¶ 10. As this Court recognized in its 2021 opinion, "allowing Groff to be skipped in the schedule every Sunday would be a clear violation of the MOU." *Groff*, 2021 WL 1264030, at *11; *see also id.* ("Skipping Groff in the Sunday rotation and never scheduling him to work on that day of the week would clearly violate the process carefully laid out in the MOU.").

Indeed, USPS faced a grievance from an employee asserting a violation of the MOU when, for a short period, the Lancaster hub effectively bypassed Groff in creating the Sunday schedule due to a miscommunication. DF¶ 54. After reviewing that grievance, the Union agreed with the employee that skipping Groff in the rotation violated the MOU. *Id.* USPS ultimately settled the matter with the Union and agreed that any "Sunday/holiday delivery schedules must be consistent with the MOU." *Id.*

Groff's requested accommodation would thus have required USPS to violate the MOU (and breach the settlement agreement on the grievance). By extension, exempting Groff would also have exposed USPS to grievances by other employees— and thus to financial costs and potential damages in connection with those grievances.

Moreover, Groff's requested accommodation threatened other contractual violations as well. As noted above, on several occasions Groff skipping his Sunday shifts left Holtwood station with no RCAs, resulting in Postmaster Hess delivering the packages himself. DF ¶ 59. As Postmaster Hess testified, this was a CBA

violation for which carriers could file a grievance. *Id.* Nor could Postmaster Hess assign Sunday work to a regular full-time rural carrier. That would separately violate the CBA. DF ¶ 25.

As this Court rightly observed in 2021, these contractual violations provide an independent ground of undue hardship under *Hardison*. *See Groff*, 2021 WL 1264030, at *11 ("the mere fact that skipping Groff in the rotation would violate the MOU is sufficient to prove undue hardship"). That remains true now and compels the same result.

Groff has previously argued that *Hardison* is limited to circumstances in which the accommodation would cause a violation of a CBA involving seniority rights. This Court rightly rejected that argument in 2021. *See id.* ("it is completely irrelevant that the CBA in [*Hardison*] was seniority-based").[4] *Hardison*'s fundamental point is that Title VII does not require an employer to "deprive [employees] of their contractual rights, in order to accommodate or prefer the religious needs of others." 432 U.S. at 81. Although the case involved a seniority system, the Court's holding addressed "otherwise valid agreement[s]," and emphasized that "[c]ollective bargaining" generally is "aimed at effecting workable

---

[4]   *See also Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762, 789 (D.N.J. 2018) ("Since *Hardison*, courts have uniformly held that compromise of a seniority system *or* violation of a collective bargaining agreement is a cognizable form of undue hardship." (emphasis added)), *aff'd*, 788 F. App'x 886 (3d Cir. 2019); *Sanchez-Rodriguez v. AT&T Wireless,* 728 F. Supp. 2d 31, 43 (D.P.R. 2010) ("While *Hardison* involved a seniority system, there is little indication that the Court's decision only applied to seniority systems.").

and enforceable agreements between management and labor" and "lies at the core of our national labor policy." *Id.* 79. The Court explained that "[a]llocating the burdens of weekend work was a matter for collective bargaining" and that employers may use a "*neutral system*, such as seniority, *a lottery, or rotating shifts*." *Id.* at 80 (emphasis added). *Hardison* by its terms thus disclaimed that its holding was limited to seniority rights.

Moreover, even assuming arguendo that *Hardison*'s holding was limited to seniority agreements, skipping RCAs like Groff in the rotation would (and did) result in the violation of a CBA involving seniority rights. The CBA governing rural carriers and the MOU implementing Sunday Amazon delivery were predicated on a seniority system. They explicitly exempted regular full-time rural carriers from Sunday work and contemplated that staffing for Sunday Amazon delivery would be completed by less senior part-time rural carriers, including RCAs—which are an entry-level position. JF ¶ 6. In other words, these contracts recognized the seniority of regular full-time rural carriers and exempted only those carriers from Sunday work. Bypassing Groff every Sunday thus violated a CBA involving seniority rights by de facto guaranteeing Groff rights for which he had insufficient seniority and that had been granted to a different, more senior class of employees.

## CONCLUSION

The record shows that USPS needed Groff—like all RCAs—to work on Sundays, and that his desired accommodation to skip all Sunday shifts had significant detrimental effects on USPS's business. Those effects qualify as an

undue hardship. This Court got it right in 2021 and should enter summary judgment for USPS.

Dated:  January 16, 2024                    Respectfully submitted,

                                            JACQUELINE C. ROMERO
                                            United States Attorney

                                            */s/ Susan R. Becker for GBD*
                                            GREGORY B. DAVID
                                            Assistant United States Attorney
                                            Chief, Civil Division

                                            */s/ Gregory B. in den Berken*
                                            Gregory B. in den Berken
                                            Fernando I. Rivera
                                            Assistant United States Attorneys
                                            Eastern District of Pennsylvania
                                            615 Chestnut Street, Suite 1250
                                            Philadelphia, PA 19106
                                            Phone:     (215) 861-8200
                                            Email:     gregory.indenberken@usdoj.gov
                                                       fernando.rivera@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GERALD E. GROFF,

      Plaintiff,

    v.

LOUIS DEJOY, POSTMASTER
GENERAL, UNITED STATES POSTAL
SERVICE,

      Defendant.

Case No. 5:19-cv-1879

## [PROPOSED] ORDER

AND NOW, this _____ day of _____ 2024, upon consideration of

Defendant's motion for summary judgment, Defendant's statement of material

facts, and the briefing on the motion, it is hereby ORDERED that Defendant's

motion is GRANTED. Summary judgment is granted for Defendant on Plaintiff's

failure-to-accommodate claim, the sole remaining claim in this case.

BY THE COURT:

_____
JEFFREY L. SCHMEHL
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 16th day of January 2024, true and correct copies of Defendant's motion for summary judgment, memorandum of law in support, proposed order, and statement of material facts and exhibits were filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
