## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GERALD E. GROFF,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **19-CV-1879** |
| | : | |
| **LOUIS DEJOY** | : | |
| **POSTMASTER GENERAL,** | : | |
| **UNITED STATES** | : | |
| **POSTAL SERVICE,** | : | |
| | : | |
| **Defendant.** | : | |

## BRIEF IN SUPPORT OF PLAINTIFF GERALD E. GROFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Aaron M. Streett, *pro hac vice*
Christopher E. Tutunjian, *pro hac vice*
Beau Carter, *pro hac vice* (pending)
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel.: (713) 229-1234

Randall Luke Wenger
Jeremy L. Samek
Janice Martino-Gottshall
INDEPENDENCE LAW CENTER
23 N. Front St.
Harrisburg, PA 17101
Tel.: (717) 657-4990


*Attorneys for Plaintiff*
*Gerald E. Groff*

Hiram Sasser, *pro hac vice*
Stephanie N. Taub, *pro hac vice*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075
Tel.: (972) 941-4444

Alan J. Reinach, *pro hac vice*
Jonathon Cherne, *pro hac vice*
(forthcoming)
CHURCH STATE COUNCIL
2686 Townsgate Rd.
Westlake Village, CA 91361
Tel.: (805) 413-7398

Joel A. Ready
CORNERSTONE LAW FIRM, LLC
8500 Allentown Pike, Ste. 3
Blandon, PA 19510
Tel.: (610) 926-7875

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

   I.   Factual Background ........................................................................................... 2

   II.  Procedural History ............................................................................................ 6

      A.   Groff files a Title VII action and this Court grants summary judgment to USPS. ......... 6

      B.   A divided Third Circuit panel affirmed. ........................................... 6

      C.   The Supreme Court unanimously vacated the Third Circuit's judgment and remanded for further proceedings consistent with its opinion. ..................................... 8

ARGUMENT ..................................................................................................................... 10

Groff is entitled to summary judgment on his failure-to-accommodate claim. ......................... 12

   I.   Groff has established his *prima facie* failure-to-accommodate claim. .............................. 12

   II.  USPS has not met its burden to produce any triable evidence to establish its undue-hardship defense ..................................................................................... 13

      A.   USPS cannot establish that all reasonable accommodations would result in undue hardship from a Sunday exemption. ....................................... 14

      B.   A Sunday exemption would not result in substantial increased costs on the conduct of USPS's business. ................................................... 17

         1.   Non-Peak Season .......................................................................... 18

         2.   Peak Season .................................................................................. 19

         3.   Coworker Impacts & the MOU .................................................... 21

CONCLUSION .................................................................................................................. 25

## INTRODUCTION

Gerald Groff believes it is his sacred obligation to "[r]emember the Sabbath day, to keep it holy," and to follow the commandment "[s]ix days you shall labor, and do all your work, but the seventh day is a Sabbath to the Lord your God." Exodus 20:8-10 (ESV). American law and culture have long respected the practice of taking a weekly day of rest from work. *See McGowan v. Maryland*, 366 U.S. 420, 431–40 (1961) (describing religious and secular origins and justifications for Sunday closing laws).

Recognizing that no American should be forced to choose between making a living or freely exercising his religious beliefs, Congress enacted Title VII of the Civil Rights Act of 1964 over a half-century ago to prevent employers from discriminating against individuals on account of their "religion." Pub. L. No. 88-352, 78 Stat. 241 (1964). But in response to certain cases "rejecting any duty to accommodate an employee's observance of the Sabbath," Congress amended the definition of "religion" in 1972 to cover "*all* aspects of religious observance and practice, as well as belief." *Groff v. DeJoy*, 600 U.S. 477, 458 (2023) (quoting 42 U.S.C. § 2000e(j)) (emphasis added). Title VII now requires employers to reasonably accommodate employees' religious practices unless doing so would inflict an "undue hardship on the conduct of the employer's business." 42 U.S.C. §2000e(j).

For decades, courts misinterpreted that "undue hardship" language to require little more than a "*de minimis*" cost to absolve an employer for discriminating against an employee's religious practice. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). This case is a textbook example of how employers grew comfortable over time with this watered-down standard: When a conflict arose between Groff's duties as a mail carrier for the United States Postal Service ("USPS") and his observance of the Sunday Sabbath, USPS claimed that respecting Groff's belief was too inconvenient and refused to offer an accommodation that would allow him to serve both

1

his God and his employer.  And USPS did so even though Groff's Postmaster contemporaneously acknowledged that accommodating Groff's religious practice would impose no meaningful burden on the conduct of USPS's business.

The Supreme Court has now spoken, realigning the employer's burden with Title VII's plain language: "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Groff*, 600 U.S. at 470.  This is a "big difference"—"undue hardship" "means something very different from a burden that is merely more than *de minimis*."  *Id.* at 464, 469.  Having restored the original understanding of Title VII, the Supreme Court remanded for this Court to apply its newly strengthened test.  *Id.* at 473.

As USPS has conceded to this point, Groff has established a *prima facie* failure-to-accommodate claim: his sincere religious beliefs required him to observe the Sabbath, he informed USPS, and USPS disciplined him for not working his Sunday shifts.  The only question that remains is whether USPS can overcome its burden of proving it would face an undue hardship by allowing Groff a Sunday exemption.  Based on the undisputed facts in this case, USPS has no evidence that accommodating Groff would result in substantial increased costs to its business. Accordingly, the Court should grant summary judgment to Groff as to liability.

## BACKGROUND

### I.  Factual Background

Petitioner Gerald Groff is an Evangelical Christian who observes a Sunday Sabbath, believing that day is meant for worship and rest.  J.S. ¶ 2; App. 2–3.  He began his employment with USPS in 2012 and became a Rural Carrier Associate ("RCA") later that year.  J.S. ¶¶ 3–4; App. 5.  An RCA is a non-career employee who provides coverage for career employees whenever they are absent.  J.S. ¶¶ 5–6.  USPS also employs Assistant Rural Carriers ("ARCs") who are hired

to work only on Sundays and holidays.  J.S. ¶ 10.  In 2014, Groff began work at the Quarryville, Pennsylvania Post Office, and he remained there until he transferred to the Holtwood, Pennsylvania Post Office in August 2016.  App. 125–26.

When Groff began to work for USPS, RCAs were not required to deliver mail on Sundays. App. 88.  This changed when USPS signed a contract in 2013 to deliver packages for Amazon. App. 27a–27b.  In 2016, USPS and the National Rural Letter Carriers' Association ("Union") entered into a Memorandum of Understanding ("MOU") that established the process for scheduling employees for Sunday and holiday Amazon delivery.  J.S. ¶ 8.  Under the MOU, USPS generated a list of RCAs and other part-time flexible carriers and asked these employees whether they wanted to work on Sundays and holidays.  J.S. ¶ 9.  Based on their responses, USPS created two lists: volunteers and non-volunteers.  *Id.*  Each list was alphabetized by last name, without regard to seniority, classification, or assigned office.  App. 136.  For Sundays and holidays, management first scheduled ARCs.  J.S. ¶¶ 10–11.  If this was insufficient to meet demand, management then scheduled from the volunteer list on a rotating basis.  *Id.*  If more coverage was needed, management would schedule from the non-volunteer list on a rotating basis.  *Id.*

The MOU created separate scheduling arrangements for "peak" and "non-peak" seasons. J.S. ¶¶ 42–44.  During peak season (mid-November through early January), each post office was responsible for scheduling its own carriers and delivering its packages on Sundays and holidays. J.S. ¶ 44.  In this timeframe, if there were too few employees to cover Sunday shifts, management could "borrow leave replacements" from other post offices, "as needed, to complete Sunday/holiday parcel delivery[.]"  App. 136.  During non-peak season (early January through mid-November), individual post offices became part of a regional hub, from which all Sunday and holiday mail was delivered.  J.S. ¶ 43.  The Quarryville and Holtwood Post Offices are part of the

Lancaster Annex hub.  J.S. ¶¶ 7, 43.  All scheduled carriers thus reported to the Lancaster Annex for non-peak Sunday or holiday delivery.  J.S. ¶ 43.

When Quarryville began Sunday Amazon deliveries in 2015, its Postmaster exempted Groff from Sunday work so long as he covered other shifts throughout the week and on non-Sunday holidays, which Groff was more than willing to do.  App. 49, 125–26.  But after the MOU went into effect in 2016, the Postmaster informed Groff that he would have to begin delivering packages on Sundays.  App. 13–15.  To avoid a conflict between work and faith, Groff transferred to Holtwood, which had not yet implemented Sunday Amazon deliveries.  J.S. ¶¶ 13–15.

In 2017, Holtwood began delivering on Sundays.  J.S. ¶ 18.  Groff informed Holtwood's Postmaster that he would not report to work on his scheduled Sundays due to his religious beliefs but pledged his willingness to work extra shifts—including on Saturdays and holidays—to avoid working Sundays.  J.S. ¶ 21; App. 156, 163.  The Postmaster refused to exempt Groff from Sunday delivery, believing that "it would be showing favoritism to allow [Groff] to avoid Sundays."  App. 156.  However, the Postmaster offered to send emails each time Groff was scheduled on Sunday asking for volunteers to cover his shifts.  J.S. ¶ 22.  The Postmaster described the success of these shift-swapping efforts as "kind of arbitrary," as RCAs did not consistently volunteer for Groff's Sunday shifts.  App. 74.  This *ad hoc* approach failed to consistently accommodate Groff throughout two years of peak and non-peak seasons.  J.S. ¶¶ 23, 30–38; *see Groff v. DeJoy*, 35 F.4th 162, 173 (3d Cir. 2022) (holding that this *ad hoc* shift-swapping "did not constitute an 'accommodation' as contemplated by Title VII because [it] did not successfully eliminate the conflict").

For a time, however, USPS effectively accommodated Groff by skipping him on the Sunday schedule or scheduling in advance an extra RCA at the Lancaster Annex on Sundays for

which Groff was scheduled.  App. 85, 90.  When the Holtwood Postmaster learned of these practices, he emailed the Lancaster Annex scheduling supervisors to express his concern.  *Id.* at 144.  He explained that USPS could discipline Groff only if his "refusing to work is causing an undue hardship/burden on the USPS."  *Id.*  For the Postmaster, that created a "dilemma" because scheduling the extra RCA "does not show a hardship/burden to the USPS."  *Id.*  Accordingly, USPS had two choices: it could continue accommodating Groff but not discipline him or it could cease the accommodation and thereby manufacture an undue hardship and a justification for disciplinary action against Groff.  *Id.*

USPS chose the latter course and ended its accommodation of skipping Groff in the Sunday rotation or automatically scheduling an extra RCA in his place.  *Id.* at 85.  From then on, when no volunteer replacement could be found for Sundays that Groff was scheduled, Groff honored his religious obligation and did not report for work.  J.S. ¶¶ 23, 36, 39.  Consistent with the Holtwood Postmaster's email, USPS's corporate representative conceded in her deposition that USPS would suffer no negative consequences if an extra RCA were scheduled in place of Groff.  App. 111–12.  She thus agreed that any burdens arose from USPS's suspension of its accommodation and its decision to schedule Groff for Sunday delivery with no back-up plan.  *Id.*  Even when USPS scheduled Groff to deliver knowing he would not show up, the impact was minimal.  USPS fulfilled its contract with Amazon, and no packages went undelivered due to Groff's absences.  App. 74a–74b.  While USPS's corporate representative alleged that accommodating Groff would have resulted in payment of overtime to other RCAs, later delivery times, and safety issues, she could not identify any evidence that those concerns ever materialized.  App. 108–09.

Groff received repeated discipline when he failed to report for Sunday delivery more than 24 times over two years.  J.S. ¶¶ 23–38.  Groff explained to the Holtwood Postmaster that when

faced with a conflict between earthly authority and God's commandments, he must always choose to honor God.  App. 129–30.  Groff reiterated his request for accommodation and sought transfer to another position that did not require Sunday work, but he was told no such non-career positions existed.  App. 74; J.S. ¶ 40.  Knowing termination was the next and final form of discipline, Groff resigned in January 2019.  J.S. ¶ 38.

## II.     Procedural History

### A.     Groff files a Title VII action and this Court grants summary judgment to USPS.

Groff sued the Postmaster General in May 2019.  Dkt. 1.  Groff asserted that USPS failed to accommodate his religious beliefs in violation of Title VII's requirement that employers must reasonably accommodate the religious exercise of employees unless doing so would impose an undue hardship on the employer.  Dkt. 7 at 8–9; 42 U.S.C. § 2000e(j).

This Court granted USPS's motion for summary judgment, denied Groff's, and entered judgment in favor of USPS in April 2021.  Dkt. 54–55.  Observing that federal circuits disagreed over whether an accommodation must eliminate, or merely lessen, the conflict between work and religion, the Court concluded that "an employer does not need to wholly eliminate a conflict in order to offer an employee a reasonable accommodation."  Dkt. 54 at 21.  Because management attempted to provide shift swaps, this Court concluded that USPS offered a reasonable accommodation to Groff that lessened the religious conflict.  *Id.* at 22.  The Court then held that exempting Groff from Sunday deliveries would cause undue hardship to USPS because it would violate the MOU and cause more than a *de minimis* impact on his coworkers.  *Id.* at 26.

### B.     A divided Third Circuit panel affirmed.

The Third Circuit affirmed. The court unanimously held that "[i]nterpreting 'reasonably accommodate' to require that an accommodation eliminate the conflict between a job requirement

and the religious practice is consistent with the meaning of the word 'accommodate.'" 35 F.4th at 169–70. Thus, USPS's *ad hoc* shift-swapping efforts "did not constitute an 'accommodation' as contemplated by Title VII because [they] did not successfully eliminate the conflict." *Id.* at 173.

The majority concluded, however, that accommodating Groff by exempting him from Sunday work would result in undue hardship under *Hardison* because it would negatively affect Groff's coworkers. *Id.* at 173–75. Relying exclusively on purported non-economic harms, it reasoned that Groff's Sunday exemptions "caused more than a *de minimis* cost on USPS because it actually imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale at both the Holtwood Post Office and the Lancaster Annex hub." *Id.* at 175. The court did not address the parties' disagreement over whether exempting Groff from Sunday duties would violate the MOU's non-seniority-based scheduling provisions, and, if so, whether that would constitute undue hardship. *See* Dkt. 54 at 23–25; *cf. Hardison*, 432 U.S. at 79, 81–82 (holding that violating seniority-based provisions of a collective-bargaining agreement could constitute undue hardship given Title VII's preferential treatment for seniority provisions).

Judge Hardiman dissented. He concluded that, under *Hardison*, a trial was necessary to determine whether USPS's alleged difficulties created an undue hardship on its business. 35 F.4th at 176–79. He explained that USPS faced scheduling challenges for only a few weeks each year during peak season (when the Holtwood Postmaster used only RCAs at that station). *Id.* at 178. He contended that USPS's assertions regarding the impact on other RCAs during non-peak season were "too speculative to be dispositive," noting that "USPS has provided no evidence that [the other] RCAs did 'more than their share' of work they were hired to perform." *Id.* at 178 n.4. To the contrary, USPS's corporate representative "conceded that scheduling an extra RCA in advance to take Groff's place on Sundays would not harm USPS; Groff's former postmaster acknowledged

the same in his email to USPS Labor Relations." *Id*. at 178.  Thus, Judge Hardiman would have reversed and remanded for trial on the undue-hardship question.  *Id*. at 179.

Groff filed a petition for writ of certiorari in the Supreme Court, arguing that (1) the "*de minimis*" test embraced by courts after *Hardison* misapplied Title VII's plain text as a standard for undue hardship under Title VII, and (2) showing effects on coworkers is not itself sufficient to show "undue hardship on the conduct of the employer's business."

### C.     The Supreme Court unanimously vacated the Third Circuit's judgment and remanded for further proceedings consistent with its opinion.

The Supreme Court unanimously sided with Groff.  In doing so, the Court clarified the standard for what constitutes an "undue hardship" under Title VII.  600 U.S. at 456–67.

The Court began by clarifying *Hardison*.  In the years since *Hardison*, many courts took *Hardison*'s reference to "more than a *de minimis* cost" and applied that as the test for undue hardship.  The Court in *Groff* said that was wrong.  *Id.* at 465.  The Court instead contextualized *Hardison*'s holding as involving seniority rights, which are "afforded special treatment under Title VII itself."  *Id.* at 462 (quoting *Hardison*, 432 U.S. at 81).  Because it was doubtful whether "any of the possible accommodations would have actually solved Hardison's [religious conflict] without transgressing seniority rights," *Hardison* held there was an undue hardship.  *Id.* at 465.  But the Court explained that *Hardison*'s "guidance on 'undue hardship' in situations not involving seniority rights is much less clear."  *Id.*  The Court thus disavowed the "*de minimis*" language as a general standard for establishing an undue hardship, and it cabined *Hardison*'s usefulness to the "principal issue" in that case—seniority rights.  *Id.* at 462 n.10.

The Court went on to construe "undue hardship" according to its ordinary meaning, settling on this formulation: "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Id.*

at 470.  It went on to say that "courts must apply the test in a manner that takes into account . . . the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost of [an] employer."  *Id.* at 470–71 (citation and internal quotation marks omitted).

Having "brush[ed] away [the] mistaken view of *Hardison*'s holding," the Court thought it necessary to address some "recurring issues" spawned by that misimpression.  *Id.* at 471–72.

*First*, the Court clarified that Title VII's undue-hardship defense is concerned with an accommodation's impact on "the conduct of the employer's *business*," not its impact on coworkers.  *Id.* at 472 (quoting 42 U.S.C. § 2000e(j) (emphasis added)).  To be sure, "an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court cannot stop its analysis without examining whether that further logical step is shown in a particular case."  *Id.*  The Court noted that "a coworker's dislike of religious practice and expression in the workplace or the mere fact of an accommodation is not cognizable to factor into the undue hardship inquiry."  *Id.* (internal citations and alteration omitted).  That is so because a hardship cannot be "undue" if it is attributable to "employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice."  *Id.*

*Second*, the Court emphasized that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations."  *Id.* at 473. "This distinction matters," said the Court:  "Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship.  Consideration of other options, such as voluntary shift swapping, would also be necessary."  *Id.*  Thus, to prevail on an undue-hardship defense, an employer must assess *all*

reasonable accommodations and conclude that each would impose a substantial increased cost or expense on the conduct of the employer's business.

The Court observed that this Court and the Third Circuit "assumed that *Hardison* prescribed a 'more than a *de minimis* cost' test," and that "may have led the court[s] to dismiss a number of possible accommodations, including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of employees." *Id.* Accordingly, the Court vacated the Third Circuit's judgment and remanded for application of the proper standard; the Third Circuit then remanded to this Court.

## ARGUMENT

Groff has established a *prima facie* failure-to-accommodate claim. Groff holds a sincere religious belief that prohibits working on the Sabbath, but that conflicts with USPS's Sunday schedule. He told USPS about that conflict. And USPS nevertheless disciplined him for adhering to his religious beliefs. That is all that is needed to establish a *prima facie* claim.

It is thus USPS's burden to establish that accommodating Groff's Sabbath observance would have caused it undue hardship. The Supreme Court confirmed that USPS must show far more than a *de minimis* cost to justify that religious discrimination. The only question remaining is whether USPS can prove it faced an undue hardship by giving Groff a Sunday exemption. It cannot. The Supreme Court was clear: An employer cannot merely assess one accommodation, call it costly, and claim undue hardship. It must assess *every* reasonable accommodation, and only those that cause substantial increased costs on the conduct of USPS's business can be weeded out. But here, USPS did not even consider multiple accommodations flagged by the Supreme Court— *e.g.*, borrowing employees from other stations to cover Groff's Sunday shifts (as expressly permitted by the MOU) or offering incentive pay for employees to work on those Sundays. While that failure to consider alternatives is dispositive, the evidence confirms that the solution was even

10

simpler.  The Holtwood Postmaster conceded that USPS incurred no undue hardship by taking Groff off the rotation so he could observe the Sabbath and replacing him with another RCA.  And USPS's corporate representative conceded in her deposition that this accommodation did not in any way harm USPS.

A Sunday exemption for Groff to observe his religious practice therefore would not impose substantial increased cost or expense on the conduct of USPS's business.  USPS has provided no evidence that a package went undelivered because Groff was not working on a Sunday.  During the non-peak season, there were 40 other employees on the list to cover 15 weekly slots, so removing one employee from that list could hardly be considered even a *de minimis* cost.  During the six-week peak season, while fewer employees were available in Holtwood, USPS could have borrowed employees from other annexes for the 2–3 Sundays a year when Groff was scheduled. And even without exploring borrowing, USPS was able to find a volunteer to cover many of Groff's peak-season shifts.  That is hardly a substantial cost on the conduct of USPS's business.

Finally, USPS cannot rely on alleged coworker impacts to avoid accommodating Groff. USPS has not shown that any effects on coworkers rose to the level of causing a substantial cost to the business, as the Supreme Court requires.  Nor does the MOU help USPS.  The MOU does not assign Sunday shifts based on *seniority*, so granting Groff a Sunday exemption would not be a *per se* undue hardship under *Hardison*.  And USPS has not established that allowing religious accommodations—which are not precluded by the MOU—would somehow disrupt employee relations in a manner that could establish undue hardship on the conduct of USPS's business.

Because Groff established his *prima facie* failure-to-accommodate claim and USPS has not proven that giving Groff a Sunday exemption would cause USPS undue hardship, the Court should grant summary judgment to Groff on liability.

## __Groff is entitled to summary judgment on his failure-to-accommodate claim.__

### I.    **Groff has established his *prima facie* failure-to-accommodate claim.**

Title VII makes it unlawful for employers to discriminate against employees on the basis of religion. 42 U.S.C. § 2000e-16(a). Failure to accommodate an employee's religious beliefs is one form of religious discrimination. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001). Title VII failure-to-accommodate claims follow a burden-shifting framework under which the plaintiff has the initial burden of proving a *prima facie* claim. *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010). To establish a *prima facie* claim, "an employee must show that he: (1) holds a sincere religious belief that conflicts with a job requirement; (2) informed his employer of the conflict; and (3) was disciplined for failing to comply with the conflicting job requirement." *Groff*, 35 F.4th at 168.[1] Groff has established all three.

*First*, Groff has sincerely held religious beliefs that conflict with USPS's job requirements. The record shows that Groff is an Evangelical Christian and believes that he must entirely refrain from secular work on the Sunday Sabbath, which includes the delivery of Amazon packages. J.S. ¶ 2; App. 2–3, 123–24. USPS substantiated Groff's need for a Sunday exemption and never doubted the sincerity of his religious beliefs and practices—as confirmed by USPS's District Manager for Labor Relations, who said he "actually *admired* [Groff's] convictions." App. 68 (emphasis added). Neither did the Holtwood Postmaster doubt the sincerity of Groff's religious beliefs. App. 71. Groff's sincerity is evident: he ultimately lost his job because of his beliefs.

*Second*, Groff promptly informed USPS of the religious conflict in March of 2017, when the Holtwood Post Office was required to begin participating in Amazon deliveries. App. 28–29, 72. Groff also repeatedly discussed the religious basis for his not working Sundays throughout his

---

[1] The Third Circuit noted that "[t]he parties do not dispute that Groff established a prima facie case for purposes of summary judgment," 35 F.4th at 168, as this Court similarly observed, Dkt. 54 at 20.

employment in each of his eight pre-disciplinary interviews, which USPS conducted precisely because Groff would not work on Sundays.  App. 128–35.

*Third*, Groff "was disciplined for failing to comply with the conflicting requirement."  *GEO Grp.*, 616 F.3d at 271.  Groff was penalized for observing the Sabbath rather than delivering packages on Sunday, receiving eight pre-disciplinary interviews, a letter of warning, a seven-day paper suspension, and a 14-day paper suspension.  App. 128–35.  Groff was eventually constructively discharged when he resigned after accruing additional Sunday absences warranting the final step in USPS's progressive discipline policy: termination.  J.S. ¶ 38.  And when USPS provided an accommodation (skipping Groff during the non-peak season) and then *revoked* that accommodation, USPS materially changed a term, condition, or privilege of Groff's employment.  42 U.S.C. § 2000e-2(a)(1).  Each of these independently establish that Groff was disciplined for adhering to his faith over USPS's conflicting demands.

Accordingly, Groff has established a *prima facie* failure-to-accommodate claim.

## II.   USPS has not met its burden to produce any triable evidence to establish its undue-hardship defense.

Because Groff established a *prima facie* failure-to-accommodate claim, the burden shifts to USPS to show either (1) "it made a good-faith effort to reasonably accommodate the religious belief," or (2) "such an accommodation would work an undue hardship upon the employer and its business."  *Groff*, 35 F.4th at 169 (citation and internal quotation marks omitted); *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) (the employer has the burden of proof regarding its affirmative defenses in Title VII actions).  The Third Circuit already held that USPS did not reasonably accommodate Groff because none of the accommodations USPS offered "successfully eliminate[d] the conflict" between Groff's religious observances and USPS's work requirements,

35 F.4th at 173, and USPS did not seek review of that issue.  The only remaining question is thus whether USPS has produced triable evidence to establish its undue-hardship defense.

Before the Supreme Court's decision in this case, an employer could establish an undue hardship by showing that accommodating an employee's religious observance would result in more than a *de minimis* cost to the employer.  *GEO Grp.*, 616 F.3d at 273.  The Supreme Court has now held that is not nearly enough:  To establish an undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  600 U.S. at 470.  And among the "relevant factors" is the "size and operating cost" of the employer, meaning "all other being things equal, larger businesses and institutions must bear a heavier burden in proving undue hardship."  *Hebrew v. Tex. Dep't of Crim. Justice*, 80 F.4th 717, 722 n.* (5th Cir. 2023) (citing *Groff*, 600 U.S. at 470–71).  USPS has not adduced evidence that would allow a reasonable factfinder to determine that exempting Groff from Sunday work would result in substantial increased costs to USPS's business.

### A.  USPS cannot establish that all reasonable accommodations would result in undue hardship from a Sunday exemption.

Before the Supreme Court's clarification of *Hardison*, the *de minimis* cost test "may have led [this Court and the Third Circuit] to dismiss a number of possible accommodations, including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of employees."  600 U.S. at 473.  As the Court emphasized, "[f]aced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship."  *Id.* Rather, "[c]onsideration of *other* options . . . would *also be necessary*."  *Id.* (emphases added).

That last part is critical.  USPS did not provide *any* reasonable accommodations in Groff's case, though plenty existed.  The only accommodation that USPS *did* assess was arranging

voluntary shift-swapping the week before he was scheduled to work on a Sunday.  J.S. ¶ 22.  It is now resolved that this was not a reasonable accommodation because "it did not successfully eliminate the conflict" between Groff's religious observance and his job duties.  *Groff*, 35 F.4th at 174.  Aside from the *ad hoc* shift-swapping arrangement, USPS did not consider other options that would have successfully accommodated Groff, and its failure to do so precludes it from claiming any hardship as undue.  *See Hebrew*, 80 F.4th at 722 (citing *Groff* and reversing summary judgment because, *inter alia*, employer failed to "thorough[ly] consider[]" "any and all" accommodations before "deny[ing] the employee's request for accommodation").  The employer "bears the burden of proof, so it must show, as a matter of law, that any and all accommodations would have imposed an undue hardship."  *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013) (cited in *Groff*, 600 U.S. at 473); *see Smith v. City of Mesa*, No. CV-21-01012-PHX-DJH, 2023 WL 8373495, at *5–6 (D. Ariz. Dec. 3, 2023) (applying *Groff* and revising pre-*Groff* disposition to conclude undue-hardship defense was unavailable to employer at trial because the employer "failed to demonstrate that any and all other potential accommodations to Plaintiff would have imposed undue hardship").  USPS cannot carry that burden.

*First*, USPS failed to consider the possibility of borrowing employees from other post offices during the "peak" season.  To refresh, peak season is the six-week span between just before Thanksgiving and the first or second week after New Year's Day.  J.S. ¶ 42.  During peak season, each post office was responsible for scheduling its own carriers and delivering its packages on Sundays and holidays.  J.S. ¶ 44.  At Holtwood, one RCA was required to be on duty every Sunday during peak season, and Groff and one or two other RCAs were stationed at Holtwood during the period in question.  *See* App. 77, 169.  That meant 2–3 days out of the year, one of the 1–2 carriers (other than Groff) available for Sunday deliveries would have had to work to cover Groff's shifts.

*See id.*  USPS relied heavily on the need for the Holtwood RCA(s) to work these few additional Sundays during the peak season to establish a more than *de minimis* cost before the Third Circuit. *See Groff*, 35 F.4th at 175 (adopting USPS's argument it burdened the Holtwood RCAs to cover Groff's Sunday shifts during peak season).

But there was another peak-season accommodation USPS failed to consider.  Under the MOU, USPS could have avoided any complications relating to Groff's absence by "borrow[ing]" an RCA from another station during the peak season. App. 136.  That is, if no other employee was available to cover a Sunday shift at the Holtwood post office, the MOU provides: "Management will utilize ARCs first; then utilize leave replacements within their own offices and then may *borrow* leave replacements, as needed, to complete Sunday/holiday parcel delivery during the [peak season]."  *Id.* (emphasis added).  Critically, USPS never did so and adduced no evidence that they even considered this option, as the Supreme Court requires.  *Groff*, 600 U.S. at 473; *Hebrew*, 80 F.4th at 722–23.  Any claimed "hardship" from accommodating Groff was thus not undue, and USPS cannot rely on any alleged difficulty, costs, or expenses incurred during the peak season as a result.

*Second*, during both the peak *and* non-peak season, USPS never assessed whether it could provide incentive pay to other carriers to voluntarily cover Groff's Sunday shifts.  *See Groff*, 600 U.S. at 473 (specifically identifying incentive pay as an accommodation that USPS failed to assess).  During earlier litigation under the *de minimis* standard, USPS relied on alleged lack of morale and other alleged harms from having to replace Groff with sometimes unwilling RCAs in the Sunday rotation.  *E.g.*, Dkt. 54 at 25 (relying on cases showing undue hardship where accommodation would "negatively affect employee morale" (internal citation omitted)); *Groff*, 35 F.4th at 174–75 (noting "diminished employee morale" as an example of hardship).  But there is

no evidence in the record that USPS ever offered to pay carriers *more* to attract a replacement for Groff's Sunday shifts, which may well have alleviated any hardship at a minor additional cost. Moreover, any debate about what amount of incentive pay would have attracted a replacement is a moot point because USPS never tried in the first place.  *See Hebrew*, 80 F.4th at 722.  Because USPS did not consider paying a premium wage to cover Groff's Sunday shifts—much less show that the costs of the necessary premium wages were "substantial . . . in relation to the conduct of its particular business"—it cannot claim that any harm from accommodating Groff was undue.

USPS's failure to consider these accommodations prevents it from establishing any undue hardship from Groff's Sunday exemption.  *See Groff*, 600 U.S. at 473; *Adeyeye*, 721 F.3d at 455 (employer must establish that "any and all accommodations" would impose undue hardship). Consequently, the Court should grant summary judgment in Groff's favor.

### B. A Sunday exemption would not result in substantial increased costs on the conduct of USPS's business.

Even setting aside USPS's fatal failure to consider ways to accommodate Groff's need for a Sunday exemption, USPS cannot avoid summary judgment under *Groff*'s heightened standard. After the Supreme Court's clarification of the undue-hardship test under Title VII, employers must now show that "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Groff*, 600 U.S. at 470.  The difference is stark, and the factual record precludes USPS from meeting this higher standard.  *See Hebrew*, 80 F.4th at 722 (noting that the employer now bears "a heavy burden" requiring "something far greater than *de minimis*").  During the non-peak season, there were more than enough workers to cover Groff's Sunday shifts in the Lancaster annex, as USPS's contemporaneous accommodation of Groff dispositively showed.  During the peak season, USPS could have borrowed carriers from other post offices or offered incentive pay, but did not.  And even without those options, an

accommodation that requires a shift swap for three days per year would not substantially increase costs or expense on USPS's business.

### 1.  Non-Peak Season

USPS's evidence of undue hardship in the non-peak season—that is, 46 weeks out of the year—is negligible and fails as a matter of law under *Groff*'s new standard.  USPS's own corporate representative conceded that USPS would *not* suffer a negative impact if an extra carrier were scheduled in advance to take Groff's place.  App. 111–12.  This is precisely the arrangement Groff had with the Holtwood Postmaster for a time, and the Postmaster's email conceded that it would not be at all burdensome to merely skip over Groff for Sunday delivery scheduling: "It is my understanding that when the Lancaster County Annex Amazon Sunday Hub schedule is created[,] the weeks that Gerald Groff is scheduled that an extra RCA is automatically scheduled to cover his parcel route.  This satisfies his religious accommodation request for Sundays and no disciplinary action is needed."  App. 144; *see Groff*, 35 F.4th at 178 (Hardiman, J., dissenting) (noting that USPS's corporate representative "conceded that scheduling an extra RCA in advance to take Groff's place on Sundays would not harm USPS; Groff's former postmaster acknowledged the same in his email to USPS Labor Relations.").

Despite this evidence, USPS argued under the *de minimis* standard that scheduling one of the many other available RCAs during non-peak season to replace Groff caused an undue hardship. Whatever the merits of that argument before, it certainly does not hold water under the "substantial increased costs" test.  During the non-peak season, carriers were drawn from all of Lancaster County, not just the Holtwood post office. J.S. ¶ 43.  That means that for 46 weeks out of the year, there were about 40 carriers to draw from for Sunday deliveries, and about 12–15 were scheduled each week on a rotating basis.  App. 173.  With Groff in the rotation, then, 15 out of 40 carriers were assigned to deliver mail every Sunday, meaning each carrier would work every second or

third Sunday throughout the year.  USPS's alleged hardship from exempting Groff would therefore amount to reducing the available number of carriers from 40 to 39—meaning each carrier would come up in the Sunday rotation just 1/40th (or 2.5%) more frequently throughout the year.  *See id.*  And even less if someone volunteered to swap shifts with Groff.  In other words, a typical carrier would have to work *at most* one additional Sunday during the 46 weeks of non-peak season to accommodate Groff (who meanwhile was willing to work all Saturdays and non-Sunday holidays).  This would hardly be a noticeable burden on individual carriers, much less on USPS as a whole, and it was something USPS had already done without hardship to accommodate Groff in the past.  It certainly cannot be considered a "substantial increased cost" for USPS's business.[2]

### 2.  Peak Season

The alleged costs from the peak season are similarly insufficient to defeat summary judgment.  During the six weeks from Thanksgiving to just after New Year's Day, each post office was responsible for scheduling its own carriers.  J.S. ¶¶ 42, 44.  At the Holtwood station, that meant that for six Sundays out of the year, there needed to be one carrier working on Sunday.  App. 77.  It is undisputed that when Groff worked at Holtwood during peak season, one of the other RCAs volunteered to cover his Sunday shift.  J.S. ¶¶ 51–53.  And as discussed above, were there a need for someone to cover Groff's shift, USPS could have borrowed carriers from other post offices under the MOU.  *Supra* Part II.A.

The undisputed facts surrounding the peak season confirm that USPS faced no undue hardship.  In 2017, Holtwood had three carriers (including Groff) who were eligible for Sunday

---

[2] USPS's corporate representative conceded that the alleged hardships—delivery delays, safety, morale, etc.—arose only when USPS scheduled Groff for Sunday delivery without a replacement, knowing he would not report for duty, leaving USPS shorthanded.  App. 111–12.  In other words, USPS's alleged hardships stemmed from their *failure* to accommodate Groff, not the accommodation of exempting Groff and scheduling another RCA in his place.  *See id.*

deliveries.  App. 169.  When Groff asked a fellow carrier to cover his Sunday shifts, she agreed, and the Holtwood Postmaster approved the swap.  App. 131–32, 169.  When that carrier suffered an on-the-job-injury in the middle of the 2017 peak season, the other eligible carrier agreed to cover Groff's Sunday shifts.  App. 74, 169.  So in the 2017 peak season, Groff would have been scheduled to work two of the six Sundays in peak season and both carriers agreed to cover his two shifts.  App. 74, 77, 169.  In the 2018 peak season, there was only one carrier other than Groff who was eligible for Sunday deliveries, but she agreed to cover his three Sunday shifts.  App. 74, 135.  Across those two peak seasons, when carriers unexpectedly had to miss those shifts because of injury or other personal reasons, the Postmaster on three occasions delivered packages to cover those carriers' shifts.  App. 82.

In short, every one of Groff's shifts was covered in the peak season—*i.e.*, USPS's *business* of delivering packages was not interrupted, and no additional cost was incurred because Groff spent Sundays observing the Sabbath.  Holtwood faced challenges only when unforeseen circumstances prevented the replacement carriers from covering Groff's Sunday shifts (as they had willingly agreed), and the Postmaster was able to cover those three days (across two years) and deliver for those missing carriers on those Sundays.  Of course, that scenario could have arisen *regardless of* Groff's Sunday exemption, whenever a scheduled carrier unexpectedly could not report for duty and a backup was out of town, for example.  *See Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 522 (6th Cir. 1975) (rejecting undue-hardship defense where hardship was "not the unavoidable by-product of any accommodation").  Those rare occurrences of Postmaster substitution hardly amount to a "substantial cost" on the conduct of USPS's business.  Accordingly, USPS cannot establish that it faced an undue hardship from giving Groff 2–3 days off a year during the peak season for him to observe the Sabbath.

### 3.  Coworker Impacts & the MOU

The last category of potential hardships involves whether the effects of Groff's Sunday exemption on his coworkers rose to the level of imposing substantial increased costs on the conduct of USPS's business.  Once again, the USPS has not adduced record evidence that could allow a reasonable factfinder to conclude that it carried its heavy burden.

**i.**  The Supreme Court singled out this subject for special consideration, and two points bear emphasis.  *First*, the Supreme Court clarified that *Hardison*'s discussion of undue hardship was focused on accommodations that would affect "seniority system[s]" under a collective bargaining agreement.  *See Groff*, 600 U.S. at 466.  That made sense because Title VII specially protects "bona fide seniority" "system[s]," such that an employer would not violate Title VII's accommodation requirement by refusing an accommodation that would abrogate seniority rights. *Id.* at 462 (citing 42 U.S.C. § 2000e-2(h)).  Because that was *Hardison*'s "core holding" and "principal issue," *id.* at 462 & n.10, the Court clarified that *Hardison* does *not* stand for the proposition that effects on non-seniority-based collective bargaining agreements establish a *per se* undue hardship.  *See id.* at 465 ("[*Hardison*'s] guidance on 'undue hardship' in situations not involving seniority rights is much less clear."); *see also DeVore v. Univ. of Ky. Bd. of Trs.*, __ F. Supp. 3d __, 2023 WL 6150773, at *5 (E.D. Ky. Sept. 20, 2023) (noting that in *Groff* "the Court did not overrule *Hardison*, [but] it limited the holding to seniority rights").

In the earlier litigation, this Court held (without the benefit of *Groff*) that exempting Groff from Sunday work would violate the MOU and therefore constituted a *per se* undue hardship.  Dkt. 54 at 26.  Indeed, this Court rejected the argument that *Hardison* was limited to seniority systems. *Id.* at 24.  Although the Third Circuit declined to reach this issue, USPS argued in the Supreme Court that an accommodation that would violate a non-seniority-based CBA constitutes an undue

hardship, Resp. Br. at 43–44, *Groff v. DeJoy*, No. 22-174 (U.S. Mar. 23, 2023), the Supreme Court rejected that reading of *Hardison*, as discussed above, 600 U.S. at 470–71.

Here, it is undisputed that there is no seniority system in the MOU's scheduling provisions for RCAs. J.S. ¶ 47. RCAs are scheduled for Sunday work on a rotating basis, and no RCA enjoys seniority over any other RCA. J.S. ¶¶ 10–11. Because Title VII does not single out CBAs generally for special treatment the way it does for seniority systems specifically, any effect that accommodating Groff would have on the MOU is not a *per se* undue hardship. *See* 42 U.S.C. § 2000e-2(h); *Groff*, 600 U.S. at 461–62. Thus, any effect on non-seniority-based CBAs—like the MOU here—is properly analyzed as another form of impact on coworkers.

*Second*, the Supreme Court held that effects on coworkers do not themselves establish an undue hardship. 600 U.S. at 471–72. Coworker impacts are only relevant when they "go on to affect the conduct of the business." *Id.* at 472 (quotation marks omitted and alteration adopted). Some are "off the table" altogether—such as "a coworker's dislike of religious practice and expression in the workplace," or "the mere fact of an accommodation" in the first place. *Id.* (quotation marks omitted and alteration adopted). The Court noted that a hardship is not "undue" if it is attributable to "employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice." *Id.* So here, the Court can only consider coworker impacts that substantially increased the costs or expense on the conduct of USPS's business, and cannot consider any impacts that flow from opposition to religion or the fact of the accommodation itself. *See id.*; *see also Hebrew*, 80 F.4th at 722 (explaining that *Groff* requires an employer to show coworker impacts "place a substantial strain on the employer's business").

**ii.** With those principles in mind, USPS cannot establish that the coworker impact from a Sunday exemption would cause it substantial increased costs or expense on the conduct of its

business.  USPS has vaguely pointed to two coworker impacts—increased workload and reduced employee morale—that allegedly caused *the coworkers* undue hardship, but USPS abandoned that position before the Supreme Court.  *See* 600 U.S. at 472 ("[B]oth parties agree that the language of Title VII requires an assessment of a possible accommodation's effect on 'the conduct of the employer's business,'" and "only 'coworker impacts' that go on to 'affec[t] the conduct of the business'" can be considered a hardship. (internal quotation marks and citations omitted)).  With that door closed, USPS must now establish some coworker impact that substantially increased the costs and expense of USPS's business.  As discussed above, USPS has not provided *any* evidence that allowing Groff to observe the Sabbath had such a business-level effect.

The only operational evidence that USPS provided involves the alleged transfer of one RCA from the Holtwood station after that RCA covered for Groff during the 2017 peak season. *See* App. 79.  But that will not suffice for multiple reasons.  For one thing, that employee's transfer (according to the Postmaster) was because the employee "thought it was not fair that [Groff] was not having to work on Sundays," *id.*—precisely the type of gripe the Supreme Court said could not be considered in the undue-hardship analysis, 600 U.S. at 472 ("[A] coworker's dislike of . . . the mere fact [of] an accommodation is not cognizable to factor into the undue hardship inquiry." (internal citation and quotation marks omitted)).  For another, USPS failed to identify any hardship to USPS's *business* from this transfer.[3]  Holtwood could have avoided the transfer in the first place by borrowing an RCA from another station to reduce the alleged burden on the carrier from covering Groff's shifts during the 2017 peak season.  And in any event, when the employee transferred *after* the 2017 peak season ended, USPS could have avoided any business effect on the

---

[3] USPS links the employee's transfer to Groff through inadmissible hearsay—the Postmaster conveying what he allegedly heard from the employee.  *See Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 603 (3d Cir. 2020) ("Facts supporting summary judgment must be capable of being presented in a form that would be admissible in evidence." (internal citations and quotation marks omitted)).

next peak season by transferring another RCA to Holtwood or hiring a replacement during the intervening 46 weeks.  Or it could have simply borrowed an RCA from another post office.  USPS presented no evidence on why any of these options would impose substantial increased costs on the business.  *See supra* Part II.A.

There were plenty of ways to accommodate Groff that did not violate the MOU and which did not impact coworkers to the point it affected USPS's business.  Indeed, USPS did not have to "violate" the MOU to accommodate Groff's Sabbath observance.  Nothing in the MOU prohibits legally required religious accommodations.  Nor did the accommodation's effect on employee rights (if any) under the MOU cause an undue hardship under *Groff*'s heightened standard. One carrier filed a union grievance arguing that he was being "forced" to work on Sundays while others were being exempted for religious reasons.  Dkt 36-2 at 331.  This complaint, of course, is the type of coworker impact the Court held could not be considered in the undue-hardship calculus.  600 U.S. at 472 (describing coworker grumbling over "the mere fact of an accommodation" for someone else as "off the table").  Also, it is undisputed that the MOU did not give this employee any right to a particular day off.  *See* J.S. ¶¶ 45, 47–48.  In response to this grievance, USPS management took the position that accommodating Groff's religious practice did not violate the carrier's contractual employment rights.  App. 175 ("Management's position is that no contractual violation exists."); *see Groff*, 35 F.4th at 177 n.3 (Hardiman, J., dissenting).  And the grievance was ultimately settled.  There is no evidence that the grievance imposed substantial costs on the conduct of USPS's business.

It would be particularly anomalous if an employer could avoid statutorily required accommodations merely because it agreed with a union not to explicitly allow such accommodations in a CBA.  After all, unions "cannot lawfully bargain for the establishment or

continuation of discriminatory practices," *Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50, 70 (1975), which is precisely what would follow if a religious accommodation were considered a violation of the CBA that occasions an undue hardship.  Thus, USPS cannot rely on the non-seniority-based MOU to avoid its legal obligations.

\*\*\*

Congress added Title VII's accommodation requirement in 1972 precisely to protect employees' rights to observe the Sabbath.  The Supreme Court restored that vital purpose in *Groff.* Under that holding, Title VII required USPS to reasonably accommodate Groff by allowing him to observe the Sunday Sabbath.  USPS cannot establish that doing so would have substantially increased the cost or expense on the conduct of its business.  Consequently, Groff is entitled to summary judgment on liability, and the case should proceed to a remedial phase.

## CONCLUSION

The Court should grant Groff's motion for partial summary judgment.

Dated: January 16, 2024

Respectfully submitted,

Hiram Sasser, *pro hac vice*
Stephanie N. Taub, *pro hac vice*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075

Alan J. Reinach, *pro hac vice*
Jonathon Cherne, *pro hac vice*
(forthcoming)
CHURCH STATE COUNCIL
2686 Townsgate Rd.
Westlake Village, CA 91361

Joel A. Ready
CORNERSTONE LAW FIRM, LLC
8500 Allentown Pike, Ste. 3
Blandon, PA 19510

*/s/ Aaron M. Streett*
Aaron M. Streett, *pro hac vice*
Christopher E. Tutunjian, *pro hac vice*
Beau Carter, *pro hac vice* (pending)
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002

Randall Luke Wenger
Jeremy L. Samek
Janice Martino-Gottshall
INDEPENDENCE LAW CENTER
23 North Front St.
Harrisburg, PA 17101

*Attorneys for Plaintiff*
*Gerald E. Groff*