IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GERALD E. GROFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:19-cv-1879 |
| ) | |
| LOUIS DEJOY, POSTMASTER GENERAL, ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**BRIEF OF AMICUS CURIAE NATIONAL RURAL LETTER CARRIERS'
ASSOCIATION IN SUPPORT OF DEFENDANT UNITED STATES POSTAL
SERVICE'S MOTION FOR SUMMARY JUDGMENT**

INTEREST OF *AMICUS CURIAE*

The National Rural Letter Carriers' Association ("NRLCA") has represented employees in the rural letter carrier craft and has sought to improve their terms and conditions of employment with Defendant United States Postal Service ("USPS" or "Postal Service") since 1903. Plaintiff, Gerald E. Groff ("Groff"), who was employed by USPS as a Rural Carrier Associate was part of the bargaining unit represented by the NRLCA.[1] The NRLCA is submitting this brief because it is deeply committed to ensuring non-discriminatory treatment for religiously observant rural letter carriers, equitable scheduling for all rural letter carriers, and a Postal Service that can thrive in an increasingly competitive marketplace.

The NRLCA currently represents 127,202 Postal Service employees who will be directly affected by the issues raised in this case. As a labor union tasked with fairly representing all

---

[1] *See*, USPS-NRLCA National Agreement ("National Agreement") pp. 1, 5-7 (Articles 1, 7) (https://nrlca.org/Documents/WebContent/EditorDocuments/userFiles/File/public/USPS%20-%20NRLCA%20%202021-2024%20Agreement.pdf)

members of the bargaining unit, the NRLCA has significant experience balancing the individual and collective interests of rural letter carriers and enforcement of its collective bargaining agreement with the USPS. In March 2023, the NRLCA filed an *amici curiae* brief together with the National Association of Letter Carriers and National Postal Mailhandlers Union when this case was before the United States Supreme Court.

The Supreme Court's June 29, 2023, opinion focused on religious accommodations under Title VII and specifically the question of what constitutes an "undue hardship" on the employer. *Groff v. DeJoy*, 600 U.S. 447 (2023), 143 S.Ct. 2279 (2023). The Court addressed the undue hardship standard it had established more than 40 years ago in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), and clarified the meaning of that part of the standard, which defines undue hardship as "more than . . . *de minimus*". *Id.* at 4-15. The Court found its *Hardison* opinion's usage of the term *de minimus* to be in conflict with the true holding in *Hardison* that to establish a successful undue hardship defense, the burdens of accommodation must be "substantial" not merely *de minimus*. *Id.* at 15-16. Thus, it clarified the holding in *Hardison* such that "'undue hardship' is shown when a burden is substantial in the context of an employer's business." *Id.*

In this brief, from its unique perspective, the NRLCA addresses the remanded issue of whether the religious accommodation demanded by Groff in this case – all Sundays off – would create substantial burdens for Defendant USPS' business, sufficient to satisfy the clarified "undue hardship" standard.

A. The National Rural Letter Carriers' Association

The NRLCA is a labor union and the sole collective bargaining representative of a unit of 127,202 rural carrier craft employees employed by the Postal Service. The NRLCA has

represented rural carriers in collective bargaining since the passage of the Postal Reorganization Act of 1970 (39 USC Section 101, *et seq*). There currently are 81,696 rural routes in all 50 of the United States and a number of U.S. territories. The rural bargaining unit contains full-time, "career" (also known as "regular") carriers and part-time "non-career" leave replacement rural letter carriers. National Agreement, pp. 5-7 (Article 7). The vast majority of regular rural carriers start as leave replacement employees, primarily as Rural Carrier Associates (RCAs), which is the largest category of leave replacement employees. Of the total 127,202 rural craft employees, there currently are 73,896 career rural carriers and 37,715 RCAs. The RCA position is the most-common entry-level, rural craft position. RCAs must be flexible and fill in where needed for regular carriers, as well as being available to deliver mail on Sundays and holidays. *Id.*, pp. 6-7 (Article 7.2). When a regular rural route becomes available in a post office, the RCA with the most seniority in that office moves up to assignment of that rural route as a career, regular rural carrier. *Id.* at 59-62 (Article 12.3.C).

While the Union's name implies that rural carriers deliver mail in rural areas, there are many thousands of rural routes in cities and suburban areas as well. There is no standard rural route. Every route is different. Some rural routes can be less than a mile long while others may be 150 miles or longer. Some routes traverse paved roads, while other routes deliver to customers on gravel or dirt roads. A few rural carriers even make their deliveries by boat. Post Office sizes vary considerably as well from small offices with only a single rural route to very large offices, with over 150 rural routes. Accordingly, in one of the largest bargaining units of employees in the United States, no two rural routes or post offices are alike.

Rural carriers also have a truly unique compensation system, which is not based upon an hourly wage like most other employees. Indeed, while other USPS employees punch a time clock

and are paid on the assumption that they will work an eight-hour day, the rural carrier evaluated pay system, by design, takes into account the multitude of differences between rural routes and post offices with rural delivery in order to arrive at an annual salary for each rural route. No other USPS bargaining unit is compensated in this way.

Decades ago, the USPS and NRLCA designed a compensation system whereby rural carriers are paid based on an evaluation of the estimated number of hours per week needed to case and deliver the mail on the particular rural route to which they are assigned. *Id.* at 15-38 (Article 9.2). In order to evaluate a rural route for compensation purposes, the parties embraced the concept of a "mail count" which was an actual counting, timing, measuring, and recording of rural route job functions – such as the number of mailboxes served and letters, parcels, and flats delivered - during a two to four-week period each year. Ultimately, each mail count element was converted into seconds, minutes, and hours, and the "standard" hours for an individual route can be computed. *Id*. at 22-23 (Articles 9.2.C.1 and 9.2.C.2). For decades, there were several dozen different mail count elements. In March 2023, however, the USPS and NRLCA implemented a "re-engineered" compensation system that was developed by industrial engineering experts over the past decade. Today there are over 100 different mail count elements, which are captured through mostly automated means. The mail counts of old are no longer and the new system, Rural Route Evaluated Compensation System (RRECS) relies on scientifically-based annualized tallies of individual rural route job functions. *Id.* at 23 (Article 9.2.C.3). These many elements add up to "standard" hours and minutes, which are converted to "evaluated" hours that correspond to annual salaries contained in pay table schedules for all rural carriers.

Finally, it should be noted that regular rural carriers are paid the same salary every pay period regardless of whether the workload for that route is above or below the standard hours

measured when the route evaluations are set. To illustrate what might happen on a given day, assume that the weekly standard hours and minutes for a particular route, when divided by six delivery days, equals 8 hours and 30 minutes per day. If on one day -- a light mail volume day perhaps -- the rural carrier completes the duties and responsibilities for that route in 7 hours and 45 minutes, the rural carrier is free to go home early. If, however, it takes the rural carrier 9 hours and 15 minutes on a heavy mail day to finish the route, there is no additional compensation. Even though there are daily fluctuations in workload, the compensation does not change day to day, week to week, or month to month. *Id.* at p. 133 (MOU 2). RCAs are paid on this same basis but because they typically do not work every day, they receive the daily evaluated route compensation for each day they work, plus overtime (pay for weekly hours over 40 and "straight-time" RCA pay for Sundays (unless their weekly hours exceed 40, in which case those hours are paid at time and one-half). *Id.* at 37-38 (Article 9.2.F).

### B. Factual Background

The opinions of this Court, the Third Circuit and the Supreme Court have accurately and comprehensively described the factual circumstances giving rise to this case, including the types of rural carriers, the growth of Sunday parcel-delivery since 2013, the May 24, 2016, USPS-NRLCA Memorandum of Understanding ("MOU") regarding the scheduling rotation for Sunday and holiday delivery, and the various accommodations that the USPS made for Plaintiff until it could no longer accommodate him without significant impact to its Sunday-delivery operations. *See*, *Groff v. DeJoy*, No. 19-1879, 2021 WL 1264030, pp. 2-10 (E.D. Pa. Apr. 6, 2021); *Groff v. DeJoy*, 35 F.4th 162, 165-167 (3rd Cir. 2022); *Groff*, 600 U.S. at 454-56.

Several facts in this case bear emphasis: as described above, RCAs like Plaintiff are leave replacements whose sole function is to serve as substitute carriers to fill in as needed on any day

5

of the week, including Sundays and holidays. Flexibility in scheduling is a key attribute of the RCA position. During all relevant periods (and ongoing), the USPS has experienced a critical shortage of leave replacements, particularly RCAs, and rapid turnover in that position. As set forth in greater detail below, only about 20 percent of post offices nationwide had a full complement of leave replacements and the Central Pennsylvania District where Groff worked was operating with only two-thirds of the required number of RCAs. S.Ct.J.A. 283.[2] This critical RCA shortage provides important context for this case.

With the growth of Sunday Amazon parcel delivery after 2013, it was very important to the USPS and NRLCA that there be an effective and fair system to schedule and deploy the relatively scarce RCAs, especially on Sundays. Thus they collectively-bargained the 2016 MOU as a means of ensuring an efficient and equitable leave replacement rotation system for Sunday work. S.Ct.J.A. 309-312. The resulting peak/non-peak/hub-and-spoke post office system was designed to create a larger pool of available leave replacement employees during most of the year. But in smaller post offices like Holtwood, PA, particularly during peak season, there were very few available RCAs. In those offices, it became difficult if not impossible to schedule Sunday delivery, and more so when a RCA like Groff refused to work his assigned Sunday shifts. As this Court correctly found, ". . . allowing Groff to be skipped in the schedule every Sunday would be a clear violation of the MOU." *Groff*, No. 19-1879, 2021 WL 1264030, at 23.[3]

---

[2]  "S.Ct.J.A." references are to the Joint Appendix used by Groff and the USPS on writ of certiorari to the United States Supreme Court.

[3]  This Court observed that the collective bargaining agreement provision at issue in *TWA v. Hardison* "was seniority-based while the MOU in this matter is not", but it appropriately found that distinction to be irrelevant. *Groff*, No. 19-1879, 2021 WL 1264030, at 24. We strongly agree that accommodations that require the breach of *any* collectively-bargained provisions would necessarily create undue hardship. Nonetheless, we also note that, while the MOU is not expressly seniority-based, it still relies on basic seniority principles to function: certain career rural carriers, who have attained sufficient seniority to bid on, and receive, regular rural routes are exempt from

Finally, Groff's refusal to work on Sundays created a "tense atmosphere" among rural carriers and managers and resulted in the resignation and transfer of several employees who were upset at the unfairness of allowing Groff to avoid his Sunday shifts, while they had to cover for him. *Groff,* 35 F.4th at 167. Moreover, at least one of Groff's coworkers filed a grievance after he became unhappy at being "forc[ed]" to work on Sundays while others (Groff) were not. *Groff*, 35 F.4th at 167, n.8; *Groff*, 600 U.S. at 455, n.1. His grievance was resolved at Step 3 of the grievance procedure after considerable effort and deliberation by USPS and NRLCA representatives. *Groff*, 35 F.4th at 167, n.8 The resulting grievance settlement reflected the parties' meaningful commitment to the terms of the MOU: that accommodations for one employee "cannot infringe upon or deprive another employee of their rights or benefits under the [MOU]." *Id*. This principle is critically important to the NRLCA. The NRLCA supports bargaining unit members' lawfully-protected exercise of religious freedom and practices, but also strives to ensure that they do not adversely impact the contractual rights and benefits of their coworkers, as did Groff's refusal to comply with his obligation under the MOU to work his assigned Sundays.

## ARGUMENT

### ACCOMMODATING PLAINTIFF GROFF'S REFUSAL TO WORK ON SUNDAYS CAUSED UNDUE HARDSHIP TO THE USPS

The Postal Service's unofficial motto is: "Neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds." https://about.usps.com/who/profile/history/pdf/mission-motto.pdf. This "swift completion of . . .

---

Sunday/holiday work under the MOU. National Agreement at 51-65 (Article 12); S.Ct.J.A. 129-132. Meanwhile, RCAs and other leave replacement carriers have not attained sufficient seniority to avoid working Sundays and holidays. Only relief employees with less seniority, such as RCAs, are included in the non-voluntary MOU work rotation. Thus, the foundation of the applicable MOU relies on seniority principles.

appointed rounds" is a very labor-intensive exercise and is central to the functioning of the USPS' business.

If one rural carrier is not delivering mail on a particular route, another must. Accordingly, accommodating one worker's request for time off as a religious accommodation necessarily requires a change to regular scheduling procedures. In this case, efforts to accommodate Groff began to cause substantial burdens to the USPS and to rural letter carriers in terms of scheduling, employee morale, compliance with collective bargaining agreements, and safety.

A. Adverse Impact on Co-Worker Workload, Shortage of Leave Replacements and Violation of the MOU

The Postal Service's attempts to accommodate Groff by skipping him in the MOU-mandated rotation "meant other carriers had to work more Sundays than they otherwise would have had to." *Groff*, No. 19-1879, 2021 WL 1264030, at 6. This may not have been the case had there been a sufficient complement of available RCAs in Central Pennsylvania. Unfortunately, there were not nearly enough leave replacements either working or available to hire. Personnel problems, while troublesome for any employer, are particularly acute in the Postal Service and the Central Pennsylvania District where there was a shortage of RCAs. S.Ct.J.A. at 10-12. Whereas the District required approximately 1,500 Rural Carrier Associates, at the relevant time, it was "459 RCAs short," meaning it was "approximately one-third understaffed for RCAs." *Id.* at 283. The Sundays-off accommodation thus exacerbated an already crippling staffing shortage, causing an even greater workload for the remaining available RCAs. *Id.* at 11-12. These same staffing shortages plague almost every District in the country.

Some of the affected RCAs quit or transferred, further exacerbating the staffing problems. During the points in Groff's employment that "the Holtwood station only had two RCAs, one being Groff, . . . the other RCA in Holtwood would be required to work *every single Sunday*

8

*without a break.*" *Groff,* No. 19-1879, 2021 WL 1264030, at 25 (emphasis added). Not only did other coworkers became unhappy about the inequitable scheduling, at least one filed a grievance, which led to a settlement reaffirming commitment to the MOU.[4] When Groff refused to work as scheduled on Sundays, "sometimes Postmaster Hess instead delivered the packages, which violated the collective bargaining agreement" and took him away from his other job responsibilities. S.Ct.J.A. at 12. These represent serious and tangible impacts to the USPS' operations, scheduling and employee morale.

The ability to work on weekdays rather than weekends is a valued privilege among career rural carriers that typically may be earned only after acquiring sufficient seniority through years of service. In the case of RCAs, weekend work is expected. However, it is likewise expected that that weekend work will be distributed equitably under the procedures of a collectively bargained MOU—a MOU that was clearly violated when the Postal Service did not assign Groff to work on Sundays. Indeed, the exceptionally complex scheduling needs of the USPS are largely governed by various collectively bargained agreements. Disruption of these collectively bargained expectations would cause a seismic change in the conduct of the Postal Service's business. Moreover, any such disruption would violate collective bargaining agreements reached on behalf of employees as a whole, disturb labor-management relations, and cause grievances. *See LeBlanc v. McDonough*, 39 F.4th 1071, 1075 (8th Cir. 2022); *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041 (7th Cir. 1996). These represent quite substantial burdens on Postal Service labor relations.

---

[4] If the NRLCA had not diligently insisted that the grievant's rights to the rights and benefits of the MOU be respected and the USPS had not joined the NRLCA in the resulting grievance settlement, there is no telling how many other employees might have sought to avail themselves of religious accommodations that would have even further exacerbated the severe RCA shortage.

### B. Adverse Effect on Employee Morale Resulting in Quits/Transfers

As noted above, employee morale also suffered when Groff refused to work on Sundays as required by the MOU. The disruption of settled expectations, on top of increased weekend work, "created a 'tense atmosphere' among the other RCAs, . . . and resentment towards management." *Groff*, 35 F.4th at 167. Groff's Postmaster explained that the accommodation at issue undermined employee morale to the point where the Postal Service lost "some very good employees who thought things weren't being handled fairly." S.Ct.J.A. at 55. According to this Court's findings, "[o]ne carrier transferred from Holtwood because he felt it was not fair that [Groff] was not reporting on scheduled Sundays. Another carrier resigned in part because of the situation." *Groff*, No. 19-1879, 2021 WL 1264030, at 6 (citations omitted). This is not a question of a ". . . co-worker's 'dislike of a religious practice and expression in the workplace'". *Groff*, 600 U.S. at 472 (citations omitted). Rather, these quits and transfers are expressions of the other RCAs' understandable discontent about the adverse impact on the amount of Sunday work they were required to shoulder and the fact that Groff's Sunday absences deprived them of their ability to take time off. All employees covet the opportunity to be home on weekends, especially Sundays, when they can spend time with family and friends who are typically not working or in school or when they can engage in other pursuits, which could involve their own religious practices.

### C. Adverse Effect on Staffing, Scheduling and Operations

As a service business, the Postal Service can run effectively and efficiently only when it has the employees it needs to handle and deliver the mail. A worker's "threat to quit [his] job . . . if forced to [work additional Sundays] does present a colorable claim of undue hardship." *Crider v. Univ. of Tennessee, Knoxville*, 492 F. App'x 609, 615 (6th Cir. 2012). Here, as noted above, at least two RCAs – in a small office – quit the USPS or transferred to different offices in large part

10

due to the burden the accommodation placed on them. *Groff,* No. 19-1879, 2021 WL 1264030, at 6. Thus, this burden on co-workers who were "required to work every single Sunday without a break" translated immediately and directly to a substantial encumbrance upon the USPS's business operations and staffing. *Id.* at 25. Even had there been an endless supply of other workers to hire, replacing employees adds time and expense to running a complex, labor-intensive business.

The NRLCA notes that – contrary to Groff's persistent contention that this case involves mere burdens on co-workers – accommodating Groff directly affected the conduct of the Postal Service's business. The timely and efficient delivery of mail is the core function of the Postal Service, and when asked at her deposition whether "Mr. Groff's absence on Sundays ever contribute[d] to making it more difficult to get packages timely delivered on a Sunday," Lancaster Hub Supervisor Diane Evans answered "Yes." S.Ct.J.A. at 224. Accommodating Groff's Sundays-off also cost the Postal Service additional overtime pay. As Brian Hess, the Holtwood Postmaster noted: "The Postal Service had to issue overtime to other carriers to cover that route. So, the more carriers you used on a Sunday, the more likely they were to run into overtime throughout the rest of the week." S.Ct.J.A. at 54-55. Such overtime costs to the USPS represent a substantial burden.

Moreover, if USPS is forced to curtail Sunday delivery when it is unable to find a replacement carrier, it would surely have negative consequences for the USPS' Amazon crucial parcel business. The Postal Service maintained that delivering Amazon packages on Sundays was "critically important" to the financial viability of the Postal Service. S.Ct.J.A. at 5. Insufficient staffing and scheduling problems have caused the USPS to curtail delivery of certain mail, including Amazon parcels, in certain rural areas, which could easily imperil the USPS' ongoing contract with Amazon, perhaps its most important customer.[5]

---

[5] *Delivery Operations – Undelivered and Partially Delivered Routes*, United States Postal

Furthermore, under the rural carrier evaluated pay system the increase in Amazon parcel volume starting in 2013, particularly on Sundays, caused many individual rural route evaluations to increase thus resulting in pay increases for all categories of rural carriers, including RCAs. As described above, RCAs are paid the evaluated compensation for the route they fill in for the regular carrier for each day they work, with overtime pay for any weekly hours over 40 and straight-time RCA pay for Sunday work, except that any Sunday hours that cause their weekly hours to exceed 40 receive overtime pay. Thus, because of the design of the pay system, which adjusts depending on workload, any loss or curtailment of that contract would have direct, adverse impacts on the evaluations of rural routes because rural carriers would be delivering fewer Amazon parcels resulting in lower annual salaries. Accordingly, scheduling, operations, compliance with NRLCA and Amazon contractual requirements and employee morale are all linked. An adverse impact to one is an adverse impact to the others, creating a domino effect that will lead to more disgruntled employees, additional quits and transfers that further reduce the available roster of relief carriers, degraded delivery performance, and violations of contractual obligations.

D. Real Safety Concerns

In addition to undermining timely delivery, accommodating Groff's Sundays off also gave rise to longer working hours for other rural carriers and supervisors, thus introducing safety concerns for the Postal Service. With fewer Rural Carrier Associates in the Central Pennsylvania District to deliver packages on Sundays, "it sometimes took 15 or 16 hours to get the mail delivered." S.Ct.J.A. at 11. These "long days caused by insufficient manpower" meant carriers were delivering mail after daylight hours. Mem. Opp. Pl's Partial Mot. Summ. Judg. at 9, *Groff v.*

---

Service, (Dec. 16, 2022), https://www.uspsoig.gov/sites/default/files/reports/2023-01/21-262-R23.pdf.

*Brennan*, Case No. 19-CV-1879 (E.D. Pa. May 01, 2019) Docket No. 42. Even when rural carriers work normal hours, their job (which includes driving on all types of roads and highways) is hazardous. Every year, these hazards cause injuries and even some deaths in the line of duty. But, delivering mail in the dark only increases the risk of accidents and other safety hazards, particularly in often-unlit rural areas. *See* S.Ct.J.A. at 264 ("the risk of accidents increases when you're carrying mail late."); *see also EEOC v. Kelly Servs., Inc.*, 598 F.3d 1022, 1033 n.9 (8th Cir. 2010) (citations omitted) ("Safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business."). The NRLCA submits that requiring the USPS to accommodate RCAs' Sundays off would put the remaining available employees at greater safety risk than otherwise and would accordingly represent an undue hardship to the USPS and to rural carriers.

## CONCLUSION

For the foregoing reasons, *Amicus Curiae* respectfully requests that this Court grant Defendant USPS' Motion for Summary Judgment on remand and dismiss Plaintiff's complaint.

Respectfully submitted,

  /s/ Mark Gisler_____
Mark Gisler (D.C. Bar No. 474628)
Michael J. Gan (D.C. Bar No. 439900)
Jean Marc Favreau (D.C. Bar No. 473235)
Peer, Gan & Gisler, LLP
1730 Rhode Island Avenue, NW, Suite 715
Washington, DC 20036
Telephone: (202) 223-1900
Fax: (202) 785-0435
gisler@peerganlaw.com
gan@peerganlaw.com
favreau@peerganlaw.com

Attorneys for *Amicus Curiae* National Rural Letter Carriers' Association

Dated: January 16, 2024